MASSACHUSETTS BAY TRANS-
PORTATION AUTHORITY,
Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 00–5071.

United States Court of Appeals,
Federal Circuit.

July 3, 2001.

Rudolph F. Pierce, Goulston & Storrs, of Boston, MA, argued for plaintiff-appellant. Of counsel was William A. Horne.

Gregory T. Jaeger, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was David M. Cohen, Director. Of counsel on the brief was Gareth Rosenau, Attorney, Federal Railroad Administration, of Washington, DC.

Before NEWMAN, MICHEL, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

Massachusetts Bay Transportation Authority (MBTA) appeals from rulings after trial by the United States Court of Federal Claims that MBTA has no entitlement to recover damages on any of its claims against the United States for alleged breaches of contract, with the exception of damages calculated as the cost to replace wooden floors with new wooden floors in the Headhouse of the railroad station ren-

ovated under the contract. Based on a web of agreements between MBTA and the Federal Railroad Administration (FRA), entered in connection with the renovation and improvement of the historic South Station in Boston, the Court of Federal Claims concluded that: (1) MBTA was not entitled to any damages for FRA's failure to secure insurance endorsements for MBTA's benefit; (2) MBTA was entitled to recover only the amount it would have cost to replace the Headhouse wooden floors with new wooden floors meeting minimum building code requirements; and (3) MBTA was not entitled to recover any damages for FRA's failure to pursue contractual rights against architectural and engineering firms in connection with design flaws that required rebuilding of certain terrazzo floors.

Because this court agrees that MBTA is entitled to recover only the amount it would have cost to replace the Headhouse floors with new wooden floors meeting minimum building code requirements, not the cost of the concrete floors actually installed, this court affirms the judgment with respect to that conclusion. The Court of Federal Claims erred, however, in concluding that FRA's obligation under section 222(c) of the Boston South Station Transportation Center Project Cooperative Construction Agreement is excused under the doctrine of impossibility, and that MBTA is not entitled to any damages for FRA's failure to secure insurance endorsements. In addition, the Court of Federal Claims erred in finding that MBTA's terrazzo floor claim is barred by the applicable statute of limitations, and that MBTA did not give the written notice regarding this claim required under the agreement between the parties.

Thus, this court reverses the findings that MBTA is not entitled to recover any damages for FRA's failure to secure insurance endorsements or FRA's failure to pursue contractual rights in connection with terrazzo floors. This court remands this case back to the Court of Federal Claims for further proceedings consistent with this opinion.

## BACKGROUND

Congress charged FRA with the implementation of the Northeast Corridor Improvement Project (NECIP) for passenger rail service and stations from Washington, D.C., to Boston under the Railroad Revitalization and Regulatory Reform Act of 1976, codified at 45 U.S.C. §§ 801–855 (1976). In 1976, FRA retained DeLeuw, Cather/Parsons (DeLeuw) as the prime contractor and architect-engineer for the NECIP to improve rail facilities, including Boston's South Station, which is owned by MBTA. The contract between DeLeuw and FRA, as well as contracts between DeLeuw and various subcontractor architects, engineers, and design professionals (the A/Es),[1] provided that these contracts were for "the sole benefit of the United States and [DeLeuw]" and that the local station owners were not third-party beneficiaries.

In 1980, FRA and MBTA entered into the Boston South Station Improvement Project Design Agreement (the Design Agreement), which established the scope of the South Station improvements to be designed by firms hired by FRA. Three years later, on September 8, 1983, the parties entered into the Boston South Station Transportation Center Project Cooperative Construction Agreement (the Construction Agreement). The Construction

---

1. DeLeuw subcontracted with Skidmore, Owings & Merill in 1976 to provide architectural support services. In 1979, DeLeuw also entered into a subcontract with Hugh Stubbins & Assocs., Inc./Castro–Blanco Piscioneri & Feder Architects to provide architect-engineering services for South Station.

Agreement required MBTA to implement the South Station improvements in accordance with the design documents provided by FRA. Any modifications to the design documents required FRA's written approval. Thus, FRA bore responsibility for design of the project, while MBTA bore responsibility for implementing its construction.

The Construction Agreement contained several provisions addressing potential liability issues. Section 220(c) of the Construction Agreement obligated FRA to seek compensation from the A/Es for design defects:

§ 220(c). FRA shall pursue with its design-phase A–E all contractual rights concerning correction of errors, omissions, and deficiencies.

Under section 222 of the Construction Agreement, FRA disclaimed any warranty to MBTA concerning the design plans and specifications procured by FRA from the A/Es:

§ 222(a). Title to the Project Design Documents shall pass to MBTA upon acceptance by MBTA. MBTA acknowledges that the Project Design Documents are being prepared by an A–E acting as a contractor to FRA, not as FRA's agent. FRA makes no warranties, express or implied, concerning the Project Design Documents. No FRA or MBTA approval given under this Agreement shall be construed as a warranty of any kind.

Another paragraph in the same section required FRA to obtain insurance endorsements from the A/Es for the benefit of MBTA:

§ 222(c). FRA shall secure from each of its consultant architect-engineers ("A/E's") an endorsement to the benefit of the MBTA on the professional liability insurance policy or policies carried by such A/E's with respect to any A/E errors, omissions, or acts of negligence in the design of the Facility. FRA shall furnish the MBTA evidence of such endorsements.

In early 1984, MBTA awarded the construction contract for the project to J.F. White Contracting Co. (White). Soon after construction began, White informed MBTA of errors in the A/Es' design plans and specifications that would delay performance. The project was eventually delayed by 965 days. In September 1987, White submitted a claim to MBTA seeking $23,680,228 for costs associated with the construction delay. To resolve liability for that delay, MBTA brought a declaratory judgment action in Massachusetts Superior Court against White, the A/Es, Amtrak, Boston Edison Company, and the Northeast Railroad Construction Company. In March and April of 1995, the parties entered a settlement agreement providing that White would receive $1.9 million from MBTA, $1.8 million from the A/Es, and $110,000 from Amtrak and Boston Edison. Consequently, MBTA released its claims against White and the A/Es. FRA, who was not a party in the state litigation, encouraged the settlement and for this purpose entered into mutual releases with the A/Es.

Meanwhile, in 1989, MBTA brought suit against FRA in the United States Court of Federal Claims for breach of contract in connection with the South Station project. Specifically, MBTA alleged that FRA breached: (1) section 222(c) of the Construction Agreement by not securing endorsements to the benefit of MBTA on the A/Es' professional liability insurance policies; (2) the Design and Construction Agreements by unreasonably withholding consent to MBTA's proposed changes of replacing the wooden Headhouse upper floors and by failing to pay for the replacement of the wooden floors with concrete; and (3) section 220(c) of the Construction

Agreement by not pursuing contractual remedies against the A/Es in connection with design defects affecting the terrazzo floors. The Court of Federal Claims determined that MBTA's waiver of warranties for design defects in section 222(a) of the Construction Agreement shielded FRA from all liability for damages due to design error. Based on that determination, the Court of Federal Claims granted summary judgment for FRA on all counts by orders dated July 19, 1996, and August 7, 1996. *See Mass. Bay Transp. Auth. v. United States,* 40 Fed.Cl. 580 (1998).

On November 3, 1997, the Court of Appeals for the Federal Circuit reversed the summary judgment and remanded. *Mass. Bay Transp. Auth. v. United States,* 129 F.3d 1226 (Fed.Cir.1997). Specifically, this court held that section 222(a) of the Construction Agreement did not shield FRA from the consequences of breaching other provisions of the contract. *Id.* at 1228. This court also found that FRA breached section 222(c). *Id.* at 1232. The court therefore remanded for a determination of the consequences of that and any other breach, as well as an assessment of appropriate damages. *Id.* at 1233. This court directed that damages should be calculated as the benefit MBTA would have received had FRA not breached any obligation under section 222(c), including the possibility of White litigation and settlement expenditures to the extent that they would have been covered by the insurance endorsements. *Id.* at 1233–34.

On remand, in an Order dated May 14, 1999, the Court of Federal Claims came to three conclusions after trial. *Mass. Bay Transp. Auth. v. United States,* No. 283–89C, slip op. at 1–2 (Fed.Cl. May 14, 1999) (*Order I*). First, according to the Court of Federal Claims, MBTA was not entitled to any damages for FRA's failure to secure section 222(c) insurance endorsements on MBTA's behalf on the A/Es' professional

liability insurance policies. The Court of Federal Claims came to this conclusion based on application of the doctrine of impossibility, and because, irrespective of the doctrine of impossibility, it determined that the endorsements would not have provided MBTA with coverage for any of its losses in connection with the White delay claim.

Second, the Court of Federal Claims concluded that MBTA was entitled to recover, under section 2.2.1h of Exhibit 1 of the Design Agreement, the amount it would have cost to replace the Headhouse wooden floors with new wooden floors meeting the minimum building code requirements, but not the cost of concrete floors. Third, the Court of Federal Claims found that MBTA was not entitled to recover any damages for FRA's failure to pursue contractual rights against the A/Es in connection with the terrazzo floors. The Court of Federal Claims determined that the terrazzo floor claim was first stated in MBTA's amended complaint, rather than relating back to the original complaint, and was therefore barred by a six-year statute of limitations. In addition, according to the Court of Federal Claims, MBTA never formally requested FRA to pursue the contractual rights prior to its amended complaint, as required under the Construction Agreement.

In a separate Order and Opinion, dated February 11, 2000, the Court of Federal Claims also granted FRA's motion for summary judgment on the issue of damages regarding the Headhouse floors. *Mass. Bay Transp. Auth. v. United States,* No. 283–89C, slip op. at 2 (Fed.Cl. Feb. 11, 2000) (*Order II*). In that Order and Opinion, the Court of Federal Claims denied MBTA's motion to modify the court's May 14, 1999 Order with regard to the conclusion that the Massachusetts Building Code would allow the replacement of the original

Headhouse wooden floors with new wooden, rather than concrete, floors. *Id.* MBTA appeals the May 14, 1999 Order, and consequently the February 11, 2000 Order and Opinion. This court has jurisdiction under 28 U.S.C. § 1295(a)(3) (1994).

## DISCUSSION

In reviewing decisions of the Court of Federal Claims, this court reviews conclusions of law, such as contract interpretation, *de novo. Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). Findings of fact made by the Court of Federal Claims, however, are reviewed under the "clearly erroneous" standard. *City of El Centro v. United States,* 922 F.2d 816, 819 (Fed.Cir. 1990); *Hankins Constr. Co. v. United States,* 838 F.2d 1194, 1195 (Fed.Cir.1988). MBTA appeals the above-mentioned conclusions by the Court of Federal Claims with regard to FRA's failure to obtain insurance endorsements under section 222(c) of the Construction Agreement, the cost of replacing the Headhouse wooden floors with concrete floors under section 2.2.1h of Exhibit 1 of the Design Agreement, and the non-pursuit of contractual remedies by FRA against the A/Es for design flaws in the terrazzo floors under section 220(c) of the Construction Agreement. This court addresses each of these issues in turn.

### A. Insurance endorsements under section 222(c)

Under section 222(c) of the Construction Agreement, FRA agreed to secure insurance endorsements to MBTA's benefit from the A/Es' professional liability insurance policies with respect to design errors committed by the A/Es. Section 222(c) also required FRA to provide MBTA with evidence of such endorsements. MBTA alleges on appeal that FRA made no effort to determine whether the A/Es or their insurers would provide insurance endorsements on MBTA's behalf before inserting section 222(c) into the contract. FRA failed to get the endorsements, despite its clear contract obligation. Moreover, FRA failed to advise MBTA that the endorsements had not been obtained after the contract was entered, and failed to notify MBTA when it unilaterally decided not to purchase, as an alternative, "special project" insurance.

### 1. Doctrine of Impossibility

There can be no question that FRA breached section 222(c) by failing to provide the insurance endorsements, because we previously so held. *Mass. Bay Transp. Auth.,* 129 F.3d at 1232. As noted by the Court of Federal Claims, however, a party has no duty to perform a contractual obligation if "performance is rendered impossible or impracticable, through no fault of the party, because of a fact, existing at the time the contract was made, of which the party neither knew nor had reason to know and the non-existence of which was a basic assumption of the party's agreement." *Order I,* slip op. at 13–14; *see United States v. Winstar Corp.,* 518 U.S. 839, 904, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Hercules, Inc. v. United States,* 24 F.3d 188, 204 (Fed.Cir.1994); *Opera Co. of Boston, Inc. v. Wolf Trap Found.,* 817 F.2d 1094, 1100–02 (4th Cir.1987); Restatement (Second) of Contracts § 266 (1979).

At trial, both parties introduced expert testimony regarding whether it would have been possible for FRA to secure the endorsements promised to MBTA. *Order I,* slip op. at 14–18. The testimony of FRA's insurance expert persuaded the trial court that it would have been virtually impossible, and completely unprecedented, to obtain the endorsements required by section 222(c). *Id.* at 17–18. The Court of Federal

Claims found FRA's expert more credible than MBTA's expert, who testified that it would have been possible, despite difficulties, for FRA to obtain the endorsements. As this court has previously stated, credibility determinations by a trial judge "can virtually never be clear error." *First Interstate Bank v. United States*, 61 F.3d 876, 882 (Fed.Cir.1995) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

The Court of Federal Claims found that performance regarding the insurance endorsements was rendered virtually impossible through no fault of FRA. The court stated that "[n]o evidence was introduced to suggest that FRA knew or had reason to know, at the time it signed the Construction Agreement, that it would be unable to secure the endorsements.... Moreover, there is nothing in the contractual language that allocates the risk of impossibility to FRA." *Order I*, slip op. at 18–19. Thus, according to the Court of Federal Claims, FRA had no reason at the time of contract to inquire whether it could secure the endorsements, particularly because both parties assumed that FRA could succeed. Thus, the Court of Federal Claims determined that FRA's contractual obligation to secure insurance endorsements on MBTA's behalf was excused under the doctrine of impossibility.

On appeal, MBTA suggests that the doctrine of impossibility applies only if the impossibility was beyond FRA's control and if it occurred without fault or negligence of FRA, citing *Jennie–O Foods, Inc.*

*v. United States*, 217 Ct.Cl. 314, 580 F.2d 400, 404 (1978), and *International Electronics Corp. v. United States*, 227 Ct.Cl. 208, 646 F.2d 496, 509 (1981). MBTA also argues that all relevant circumstances at the time of contracting were under FRA's control and that FRA was negligent when it insisted on inserting section 222(c) in the contract, rather than an indemnification clause as MBTA initially requested, without first checking to see whether such endorsements would be obtainable.

While MBTA's overall argument has merit, *see Winstar*, 518 U.S. at 904, 116 S.Ct. 2432, Restatement (Second) of Contracts § 266(1), neither *Jennie–O–Foods* nor *International Electronics* expressly holds that fault or negligence of the party asserting it prevents reliance on the application of the doctrine of impossibility. These two cases simply indicate that when a contract provision states that a contractor is not liable for "causes beyond the control and without the fault or negligence" of the contractor, the contractor must allege and prove impossibility of performance to take advantage of that contract provision. *Jennie–O–Foods*, 580 F.2d at 408;[2] *Int'l Electronics*, 646 F.2d at 510.[3]

■ This court has made clear, however, that, as the party asserting impossibility, FRA "has the burden to prove that it explored and exhausted alternatives before concluding that the contract was legally impossible or commercially impracticable to perform." *Blount Bros. Corp. v. United*

---

**2.** "But Article 3(c) [of plaintiff's contract] ... indicates that in order for plaintiff to take advantage of the ... excusable delay factor, it must also be found that such excuse was beyond its control and without its fault or negligence.... If plaintiff were to succeed on this issue, it would have to allege and prove impossibility of performance." *Jennie–O–Foods, Inc. v. United States*, 217 Ct.Cl. 314, 580 F.2d 400, 408 (1978).

**3.** "To avail itself of the excusable delay provision, plaintiff has the burden of proving that the excuse was beyond its control and without its fault or negligence.... Hence, [plaintiff] must establish impossibility of performance...." *Int'l Elecs. Corp. v. United States*, 227 Ct.Cl. 208, 646 F.2d 496, 510 (1981).

*States,* 872 F.2d 1003, 1007 (Fed.Cir.1989) (citing *Jennie–O–Foods,* 580 F.2d at 409); *cf. RNJ Interstate Corp. v. United States,* 181 F.3d 1329, 1331 (Fed.Cir.1999) ("Destruction of the situs of performance by fire is a classic case for application of the impossibility doctrine."); *Hercules,* 24 F.3d at 204 ("[T]he common-law doctrine of impossibility of performance ... excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed.").

Moreover, as articulated in the Restatement of Contracts with regard to "Existing Impracticability,"

> Where, at the time a contract is made, a party's performance under it is impracticable *without his fault because of a fact of which he has no reason to know* and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts § 266(1) (emphasis added); *Twombly v. Ass'n of Farmworker Opportunity Programs,* 212 F.3d 80, 85 (1st Cir.2000).

According to the testimony of FRA's own insurance expert during trial, "[b]y 1983, it was virtually impossible and in '84 was impossible" to obtain such endorsements. Contrary to the finding by the Court of Federal Claims, other evidence in the record also indicates that FRA had reason to know, even if it did not actually know, at the time it signed the Construction Agreement, that it would likely be unable to secure the insurance endorsements. FRA, rather than MBTA, insisted on the insertion of the particular provision on endorsements in the Construction Agreement. Moreover, FRA was in a much better position, as the primary contractor with the A/Es, as a contractor who had previously inserted such provisions in similar contracts with other station owners, and as the drafter of the contract at issue, to ascertain whether such endorsements were possible.

Despite the fact that FRA drafted and inserted section 222(c), FRA made no effort whatsoever to ascertain whether the endorsements were feasible to obtain. In fact, FRA did not even bother to check whether the A/Es' insurers had provided endorsements to other local station owners who had entered similar contracts with FRA with similar provisions, prior to MBTA. As conceded by FRA during trial, if FRA had made such inquiries, it would have discovered that the A/Es had failed to seek any such endorsements on behalf of other local station owners, with the exception of one A/E, Skidmore, Owens & Merrill, whose insurer actually refused to provide endorsements to benefit the New Carrollton station in Maryland.

This court is also disturbed by evidence suggesting that even as late as three years after the parties entered the Construction Agreement, and more than two years after FRA first became aware of the impossibility, FRA still did not notify MBTA that it had failed to secure any endorsements. *Order I,* slip op. at 11–12. Regardless of whether the endorsements were impossible to obtain, it certainly was possible for FRA to notify MBTA of the unavailability of the endorsements as soon as FRA became aware of it. By failing to at least inform MBTA of the problem, FRA placed MBTA in the precarious position of both being uninsured and being unaware that it was uninsured, and FRA did so without excuse or explanation. Both omissions, i.e., failing to obtain the endorsements and failing to inform MBTA of that failure, were clearly breaches of section 222(c).

■ Thus, this court concludes that the Court of Federal Claims clearly erred in concluding that FRA's obligation under section 222(c) was excused under the doctrine of impossibility. We hold that FRA had reason to know, even if it did not actually know, that the insurance endorsements were impossible to obtain at the time of contracting. Moreover, it certainly was possible for FRA, at the time it actually became aware of the impossibility, to "furnish the MBTA evidence" that it would be unable to obtain those endorsements. That it did not do so is not only an unfortunate breach of the contract, but an unseemly act for a government agency. Nor were these failures without consequences, for in combination they effectively prevented MBTA from getting its own insurance.

### 2. Previous satisfaction of any liability

The Court of Federal Claims determined that even if FRA's breach of its obligation under section 222(c) was not excused by the doctrine of impossibility, MBTA still was not entitled to any amount of damages for that breach. *Order I*, slip op. at 19. The Court of Federal Claims based its conclusion on the rationale that "[i]f the endorsements would not have covered any of MBTA's [litigation and settlement] expenditures, then MBTA did not incur any damage from FRA's breach and thus [was] not entitled to recover any amount in damages for the breach." *Id.*

In this case, MBTA asks FRA to reimburse it for the $1.9 million in damages that MBTA paid White to settle the state litigation, as well as associated legal costs (estimated to be just over $2 million) and interest. The Court of Federal Claims

initially explained that because MBTA had not provided professional A/E services, the endorsements would not have provided MBTA with coverage for any of its losses in connection with the White delay claim. *Id.* at 20. This reasoning is misplaced, however, especially in light of *Massachusetts Bay Transportation Authority*, 129 F.3d at 1231, which clearly concludes that section 222(c) is not limited to insurance coverage of MBTA's design errors made in its capacity as an A/E.

Moreover, section 222(c) expressly states that "FRA shall secure ... an endorsement ... with respect *to any A/E errors, omissions, or acts of negligence* in the design." (Emphasis added.) Thus, assuming FRA had obtained endorsements from the A/Es' insurers, those endorsements would have covered what the insurers would have paid to settle a lawsuit involving alleged A/E design errors. As discussed above, MBTA brought a declaratory judgment action in Massachusetts Superior Court for the purpose of resolving liability arising from White's delay claim against MBTA. Among others, MBTA sued the A/Es in that action.[4] All the parties to the declaratory action, including MBTA and the A/Es, individually negotiated the amount they would pay to settle the case in the situation where insurance endorsements had not been obtained.

Because the A/Es had their own insurance coverage, the A/Es' insurers presumably paid the $1.8 million to White on behalf of the A/Es because that was the amount they were willing to pay, as direct insurers, to settle the White litigation regarding alleged errors, omissions, or acts of negligence by the A/Es. The question

---

4. As stated in MBTA's brief to this court, "despite the 'sole benefit' provisions in the designers agreements, MBTA did sue [the A/Es] for designer error and, more importantly, defeated their efforts to obtain summary

judgment on the basis of a lack of 'privity.' (Ex. 258, A4405)." Brief for Appellant at 45, *Mass. Bay Transp. Auth. v. United States*, No. 00–5071 (Fed. Cir. filed Mar. 5, 2001).

here, however, is whether the A/Es' insurers would have paid anything beyond the $1.8 million, i.e., any part of the $1.9 million paid by MBTA, to settle the case, assuming the insurance endorsements for MBTA had been obtained.

The Court of Federal Claims took into account the "Sverdrup analysis," a critical path method analysis prepared in 1992 and used by MBTA during settlement negotiations concerning the White litigation. The Sverdrup analysis concluded that White was responsible for 46%, the A/Es were responsible for about 40%, and MBTA was responsible for about 14% of the overall delay. *Order I*, slip op. at 22. The court also considered, however, testimony from Carl Hepworth, FRA's expert in critical path method and damage analysis. Mr. Hepworth testified that MBTA's Sverdrup analysis was flawed in four respects: (1) it failed to account for the impact of delays occurring on parallel concurrent paths; (2) it did not account for time extensions granted to White based on change orders, for which there was no allocation of A/E responsibility; (3) it allocated 100 percent of the credit for time regained during construction to MBTA, instead of crediting the time on a pro-rata basis between all parties; and (4) it did not consider the extent to which MBTA could have mitigated delays. *Id.* at 23. Mr. Hepworth further concluded, based on his own critical path method analysis taking those four factors into account, that the A/Es were not ultimately responsible for any of the White delay damages.

The Court of Federal Claims found Mr. Hepworth's analysis more persuasive than MBTA's Sverdrup analysis. Based on Mr. Hepworth's analysis, the court concluded that MBTA failed to show that the A/Es' insurers would have paid White any part of the $1.9 million, even assuming the endorsements had been obtained. *Order I*, slip op. at 23. This court is constrained by a highly deferential standard of review with regard to witness credibility determinations by the trial court. Based on that standard of review, the thoroughness of Mr. Hepworth's testimony and his own critical path analysis, as well as MBTA's failure to rebut any alleged errors in its Sverdrup analysis, we cannot say that the trial court clearly erred in relying on Mr. Hepworth's conclusions regarding design error and causation of the delay.

As stated by this court in *Massachusetts Bay Transportation Authority*, however, damages in this situation turn on the amount that "would have been covered or *MBTA relieved thereof* under the insurance endorsements." 129 F.3d at 1232 (emphasis added). The amount of delay damages caused by each party is just one factor that must be considered in determining what a reasonable insurer would have paid to settle the White litigation on behalf of both the A/Es, who were directly insured, and MBTA, who would have been insured via the insurance endorsements. While causation is an important factor, particularly with respect to what "would have been covered" under the insurance endorsements, other factors must also be examined with regard to what may have been "relieved thereof." For example, as suggested by Peter Hermes, MBTA's insurance expert, the insurers might have paid for MBTA's portion of the settlement because the total settlement amount of $3.8 million (for both MBTA and the A/Es) was reasonable or financially advantageous in light of the original claim for $23.6 million, as well as the potentially high cost and large amount of time involved in going to trial.

■ The Court of Federal Claims concluded that a reasonable insurer would not have indemnified MBTA for the $1.9 million it paid to settle the White litigation, even assuming MBTA had obtained effec-

tive insurance coverage for claims brought against it based on design error. This court finds that the Court of Federal Claims erred when it based that conclusion simply on the finding that Mr. Hepworth's testimony demonstrated that the A/Es were not ultimately responsible for any of the White delay damages.

Thus, this court remands this issue back to the Court of Federal Claims so that it may properly address the question of what "would have been covered or MBTA relieved thereof under the insurance endorsements," assuming those endorsements had been properly obtained. *Mass. Bay Transp. Auth.*, 129 F.3d at 1232. While this court recognizes that the Court of Federal Claims did not err in determining that the insurance endorsements would not have "covered" errors, omissions, or acts of negligence by MBTA, the court did not properly determine what a reasonable insurer would have paid to settle the White litigation on behalf of both the A/Es and MBTA, i.e., what MBTA would have been "relieved thereof" with regard to the $1.9 million.

On remand, the Court of Federal Claims has discretion, as it deems necessary, to reopen and supplement the record to allow for admission of new evidence from both parties on this issue. Alternatively, the Court of Federal Claims may make its determination based on the existing record. When making the proper finding, however, the Court of Federal Claims must take into account all relevant factors, including, but not limited to, causation by the parties, what would have been a reasonable or financially advantageous settlement in light of the original claim for $23.6 million, as well as the potentially high cost, large amount of time, and nuisance involved in going to trial. The court must then determine what amount (if any) a reasonable insurer, i.e., one insuring the A/Es directly and MBTA via the insurance

endorsements, would have paid beyond the $1.8 million actually paid on behalf of the A/Es alone. Assuming that the insurers would have paid anything beyond the $1.8 million, the court must then ascertain the total damages owed to MBTA, including appropriate associated legal costs and interest. The court may also consider whether any additional damages resulted from FRA's breach of section 222(c) by failing to notify MBTA in a timely manner that it would be unable to obtain the insurance endorsements.

**B. Damages for replacement of the Headhouse wooden floors under section 2.2.1h of Exhibit 1**

■ Section 2.2.1h of Exhibit 1 of the Design Agreement states: "Correct code deficiencies and safety hazards including reconstruction of the fire egress, detection and protection systems. This includes necessary work on floors 3, 4, and 5 of the headhouse." Based on this section, this court agrees with the Court of Federal Claims that MBTA is only entitled to recover the amount it would have "cost to repair/replace the Headhouse floors so that they would have met the minimum building code requirements.

MBTA argues that FRA authorized the method of replacing the unsafe wooden floors with concrete floors when an FRA representative wrote "Scope—OK" on a change order on September 30, 1985, even though FRA refused to approve the proposed funding allocation for the work. As noted by the Court of Federal Claims, however, MBTA failed to introduce satisfactory evidence indicating that the replacement of the floors with wooden floors would have been insufficient to meet the building code requirements, or conversely, that concrete floors were required to meet the code. Moreover, although MBTA argued that the code did not allow

replacement of the original floors with new wooden floors, MBTA did not offer any evidence regarding the replacement cost in its response to FRA's summary judgment motion regarding damage amounts. FRA, on the other hand, submitted evidence that new wooden floors meeting the minimum building code requirements could have been installed for $275,189.

In its reply brief to this court, MBTA argues that it did submit evidence to show that the Massachusetts Building Code prohibited replacement of the wooden floors with new wooden floors, referring to a declaration signed by Hugh Caspe, a professional engineer specializing in construction. In his declaration, dated September 15, 1999, Mr. Caspe stated:

> Wooden floors by themselves will not comply with the 1½ hour rating even if fire retardant wood were used and therefore wooden floors could not have been used for construction of the new headhouse floors. . . .
>
> . . . .
>
> . . . The replacement floors proposed by Parsons would not meet the requirements of the Code in that the proposed wooden floors fail to meet fire resistance ratings required by the Code.

Mr. Caspe's declaration, however, was submitted in response to FRA's motion for summary judgment regarding the amount of damages, rather than during trial or before the Court of Federal Claims issued its May 14, 1999 post-trial Order. In fact, the Court of Federal Claims stated in its post-trial Order that Mr. Caspe testified during trial only to "a vague recollection of having seen a document that indicated that 'the Fire Chief' wanted concrete floors," but was unable to produce that document. *Order I*, slip op. at 35. Thus, Mr. Caspe's testimony during trial was insufficient to overcome evidence supporting the Court of Federal Claims' May 14, 1999 conclusion

that new wooden Headhouse floors would meet minimum building code requirements.

Because MBTA did not submit Mr. Caspe's declaration until September 1999, four months after the Court of Federal Claims issued its post-trial Order, the Court of Federal Claims considered Mr. Caspe's declaration only with regard to MBTA's motion to modify, which the court treated as a Fed.R.Civ.P. 59(d) motion to reconsider, alter, or amend the court's May 14, 1999 Order. *Order II*, slip op. at 6, 12 n. 6. Thus, our standard of review for granting summary judgment does not apply to the issue addressed in the May 14, 1999 post-trial Order—i.e., whether new wooden floors would meet minimum building code requirements. Instead, this court reviews the Court of Federal Claims' denial of MBTA's motion to modify/reconsider for abuse of discretion in light of evidence, such as Mr. Caspe's declaration. *Ajinomoto Co. v. Archer–Daniels–Midland Co.*, 228 F.3d 1338, 1350, 56 USPQ2d 1332, 1341 (Fed.Cir.2000); *United States v. Roberts*, 978 F.2d 17, 20 (1st Cir.1992) ("We review the trial court's refusal to grant relief on reconsideration for possible abuse of discretion.").

Article 22, § 2203.3, of the Third Edition of the Massachusetts State Building Code states: "Any new building system or portion thereof shall conform to this code for new construction *to the fullest extent practical.* However, *individual components of an existing building system may be repaired or replaced without requiring that system to comply fully with the code for new construction.*" *See Order II*, slip op. at 12–13. Article 22, § 2203.4 goes on to state that: "Alterations or *repairs to existing buildings which* maintain or *improve the performance of the building may be made with the same or like material.* Full compliance to the provisions of section

2203.0 is not required unless there is a change in use." *Id.* at 13 (emphasis added).

In his declaration, Mr. Caspe asserts that Table 214 of the Massachusetts State Building Code requires a fire resistance rating of 1½ hours for the Headhouse floors, and that wooden floors by themselves would not comply with the 1½ hour rating even if fire retardant wood were used. Mr. Caspe also concludes that section 2203.3 does not apply to the Headhouse floors because that floor system is a "building system" as defined in section 2201.0, and the Headhouse floors cannot be an individual component of an existing building system within the meaning of section 2203.3. In response, the Court of Federal Claims states:

> There is no way under the code to check [Mr. Caspe's] ultimate (and unsupported) opinion that "wooden floors by themselves will not comply with the 1½ hour rating even if fire retardant wood were used" because the code requires testing instead of stating what will and will not meet specific fire ratings. Notably, [FRA's] expert does not disagree with [MBTA's] expert's conclusions. Instead, [FRA's expert] maintains, as this order states, that the requirements for new construction are not relevant.

*Order II*, slip op. at 12 n. 6.

It is not abundantly clear from Mr. Caspe's declaration how he came to the conclusion, in light of sections 2201.0 and 2203.3–2203.5, that the floor systems cannot be considered as an individual component of an existing building within the meaning of section 2203.3. Section 2201.0 merely defines "building systems" without expressly mentioning floors or otherwise indicating that floors are "building sys-

tems" that must be replaced as a new construction.[5] Even assuming that the floors are a "building system," however, section 2203.3 states that any new building system "shall conform to this code for new construction *to the fullest extent practical.*" Moreover, as noted by the Court of Federal Claims, while section 2203.5 does specifically address code requirements for new floors, that section merely discusses structural load requirements, rather than fire resistance ratings.

None of the sections of the code cited by either MBTA or Mr. Caspe expressly require that floors replacing existing floors in an existing building must conform to the code's requirements for a *new* construction. On the contrary, we hold that sections 2203.3 and 2203.4 of the Massachusetts Building Code allow wooden floors in an existing building to be replaced with the same or like material, i.e., wooden floors, that otherwise meet the minimum building codes applicable to that existing building. Thus, the Court of Federal Claims did not abuse its discretion when it denied MBTA's motion to modify/reconsider, in light of the applicable code and other evidence.

**C. Contractual rights under section 220(c) for design flaws affecting the terrazzo floors**

**1. Statute of Limitations**

Under section 220(c) of the Construction Agreement, FRA agreed to pursue all contractual rights on MBTA's behalf concerning the correction of design errors made by the A/Es. MBTA first noticed extensive cracking in the terrazzo floors of the South Station in April 1989. As MBTA admits, however, the original complaint (filed a

---

5. Section 2201.0 defines "building systems" as "[a]ny mechanical, structural, egress, electrical, plumbing, building enclosure and/or fire protection system, or fire resistive construction system, or portion thereof." *Mass. Bay Transp. Auth. v. United States*, No. 283–89C, slip op. at 13 n. 7 (Fed.Cl. Feb. 11, 2000).

month later) did not include a claim specifically addressing the terrazzo floors, primarily because MBTA had not yet ascertained that the cracking was the result of design error by the A/Es. The Court of Federal Claims determined that MBTA could not recover any damages regarding the terrazzo floors claim because that claim was barred by the applicable statute of limitations (six years). *Order I*, slip op. at 41. Specifically, because the original complaint did not include a claim relating specifically to the terrazzo floors, the Court of Federal Claims concluded that the terrazzo claim did not relate back to the original complaint, filed May 18, 1989. Instead, according to the Court of Federal Claims, it related to the amended complaint filed on August 25, 1995, more than six years after MBTA first noticed cracking in the terrazzo floors in April 1989.

On appeal, MBTA points out that the trial court stayed this case in December 1991 pending the outcome of the White litigation in state court. After the White litigation was settled in mid-August 1995 (almost four years later), the Court of Federal Claims lifted the stay, and MBTA filed its amended complaint on August 25, 1995. MBTA also argues that its claim did not ripen until FRA learned of the cause of the terrazzo floor cracking when it received a report from engineers (Stone & Webster) commissioned by MBTA in June of 1990.

The applicable part of Rule 15(c) states: "An amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." R.C.F.C. 15(c) (2000). Because the original complaint did not include the terrazzo floor claim, the claim asserted in the amended pleading did not arise out of an occurrence set forth in the

original pleading. The terrazzo floor claim therefore did not relate back to the original complaint. Thus, the Court of Federal Claims was correct with regard to this finding.

■ On the other hand, MBTA did not definitively know that the terrazzo floor cracking was the result of design error until June 1990, when Stone & Webster presented its report attributing 84% of the cracking to design error and 16% to a combination of contractor and designer error. In other words, the claim did not accrue until June 1990, when MBTA first became certain that the cracking was due to design error by the A/Es. Thus, we hold that because MBTA filed its amended complaint on August 25, 1995, within six years of June 1990, MBTA was not barred by the applicable statute of limitations regarding the terrazzo floors claim.

**2. Written notice**

The Court of Federal Claims also determined that FRA's obligation under section 220(c) was not triggered prior to MBTA filing its amended complaint because MBTA never provided FRA with written notice, as required under section 106 of the Construction Agreement. Section 106 states: "Any notice, transmittal, approval, or other official communication made under this Agreement shall be in writing...." By the time MBTA filed its amended complaint, according to the Court of Federal Claims, FRA no longer had any contractual rights against the A/Es, based on reciprocal releases entered into with the A/Es in April 1995 to facilitate settlement of the White litigation. *Order I*, slip op. at 42.

■ FRA's primary contact with MBTA, Mr. Richard Cogswell, had signature authority over the South Station Project. Mr. Cogswell was aware of the terrazzo floor problem as early as 1989.

Specifically, as evident from his testimony during trial, Mr. Cogswell received a copy of the Stone and Webster report from MBTA soon after the report was prepared in June 1990. Because that report concluded that the terrazzo floor problem was mostly attributable to A/E design error, and because FRA, via Mr. Cogswell (*see* section 202 of the Construction Agreement), did receive a copy of that report, this court finds that MBTA satisfied the written notice requirement under section 106. The Stone and Webster report was sufficient to put FRA on notice that it was required to comply with section 220(c) of the Construction Agreement. That, in FRA's view, the notice should have demanded that FRA pursue contractual rights with the A/Es in connection with the terrazzo floors does not defeat notice here because section 220(c) places an affirmative duty upon FRA to pursue claims within its knowledge. Nothing in section 106 or section 220 suggests otherwise.

As mentioned, but not addressed, in the May 14, 1999 post-trial Order, FRA raised an additional argument with the Court of Federal Claims. Specifically, FRA argued that " § 220(c) did not require it to pursue its contractual rights against the A/Es in connection with the terrazzo floor claim, because that provision relates only to contractor claims, whereas the terrazzo floor claim is a claim by MBTA, not a contractor." *Order I*, slip op. at 40. Because contract interpretation is a question of law, we interpret section 220(c) for the purpose of any question that might be raised on remand with regard to this argument.

■■■ If MBTA has no claim against FRA under section 220(c) with regard to the design flaws affecting the terrazzo floors in this case, that provision of the Construction Agreement is meaningless. Even assuming "contractor claims" as discussed in section 220(a) refers only to claims brought by White, White could only

raise a claim against MBTA. Presumably, White could not bring any "contractor claim" against either FRA or the A/Es because White did not contract with those parties and therefore had no privity of contract. Thus, in order for section 220(c) to have any meaning, a "contractor claim" with regard to section 220(c) must refer to a claim brought by MBTA against FRA, who was obligated to pursue its "contractual rights" against the A/Es. Consequently, we hold that MBTA, as a contractor with FRA, may raise its terrazzo floor claim under section 220(c) against the FRA.

In sum, the Court of Federal Claims erred in concluding that MBTA's terrazzo floor claim was barred by the applicable statute of limitations, and that MBTA did not give proper written notice regarding this claim as required under the Construction Agreement. These conclusions are reversed, and this case is remanded to the Court of Federal Claims for a determination of damages with regard to the terrazzo floor claim under section 220(c) of the Construction Agreement.

## CONCLUSION

The Court of Federal Claims correctly concluded that MBTA is only entitled to recover the amount it would have cost to replace the Headhouse floors with new wooden floors meeting the minimum building code requirements. This court affirms that portion of the May 14, 1999 Order, as well as the February 11, 2000 Order and Opinion. The Court of Federal Claims erred, however, in concluding that FRA's obligation under section 222(c) is excused under the doctrine of impossibility, and that regardless of the doctrine, MBTA is not entitled to damages for that breach. The Court of Federal Claims also erred in concluding that MBTA's terrazzo floor claim is barred by the applicable statute of limitations, and that MBTA did not give

proper written notice to FRA regarding this claim. This court therefore reverses these portions of the May 14, 1999 Order. This court remands for a determination of what "would have been covered or MBTA relieved thereof under the insurance endorsements," assuming those endorsements had been properly obtained. This court also remands for a determination of what damages MBTA is entitled to for FRA's failure to pursue contractual rights in connection with design defects affecting the terrazzo floors.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*