ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Quality Trust, Inc. | ) ASBCA No. 62576 |
| | ) |
| Under Contract No. FA2517-19-P-A083 | ) |

APPEARANCE FOR THE APPELLANT:    Mr. Lawrence M. Ruiz
    President

APPEARANCES FOR THE GOVERNMENT:    Jeffrey P. Hildebrant, Esq.
    Air Force Chief Trial Attorney
    Jason R. Smith, Esq.
    Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE CLARKE
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The Air Force (AF) moves for summary judgment on Quality Trust, Inc.'s (QTI's) appeal of its termination for cause. The AF justifies its termination of QTI for its failure to (1) install five walk-in refrigeration units, (2) pay the invoices for temporary refrigeration units, and (3) provide assurances of its performance of these obligations. Having found information in the record that the AF did not discuss, we feel the record is incomplete and there are material facts and salient legal issues that the parties have not fully briefed. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We deny the motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. The AF awarded Contract No. FA2517-19-P-A083 to QTI on September 28, 2019, valued at $179,000. This contract was for "all labor, materials, transportation, disposal, and supervision to replace four (4) walk-in refrigerators and one (1) freezer at Aragon Dining Facility" at Peterson Air Force Base in Colorado under a single contract line item number. (R4, tab 3 at 1, 3) The contract incorporated Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS-COMMERCIAL ITEMS (OCT 2018), which incorporated FAR 52.233-1, DISPUTES (MAY 2014) by reference (*id.* at 11). The Statement of Work (SOW) also contained the following text:

**NOTE: THE EXISTING COMMERCIAL GRADE
REFRIGERATION SYSTEM LOCATED OUTSIDE
THE DINING FACILITY THAT**

**POWERS/SUPPORTS WALK-IN BOXES WILL NOT BE REPLACED. HOWEVER, IN THE PROCESS OF REPLACING THE WALK-IN REFRIGERATOR BOXES AND THE WALK-IN FREEZER BOX, THE CONTRACTOR MAY BE REQUIRED TO DISCONNECT AND THEN RECONNECT THE CURRENT REFRIGERATION SYSTEM** . . .

The contractor shall provide industry standard warranty covering walk-in boxes elements [*sic*].

(R4, tab 2 at 3) (Emphasis in original) QTI was to complete the work by December 28, 2019 (R4, tab 3 at 7).

2. QTI and the AF signed Modification No. (Mod.) P00001 on December 26, 2019, which changed the contract's delivery date from December 28, 2019, to March 9, 2020. Further, the Mod. provided that due to "Contractor delay, Quality Trust, Inc. is hereby responsible for any costs associated with the lease of temporary refrigerated trailers . . . beyond the mutually agreed upon date of 9 January 20[20]."[1] (R4, tab 15)

3. The government states in its undisputed facts that, during a site visit on January 6, 2020, appellant's president, Mr. Ruiz,

[E]xpressed concern about the outside compressor units needing replacement, or he would not be able to warrant the new inside units that he contracted to install (citation omitted). He verbally indicated to CO Lytie that he may be able to refurbish the inside units and repair or replace the outside units without increase to the Contract price. CO Lytie told Mr. Ruiz that he would have the base engineers inspect the outside units and do their own assessment of whether they needed to be replaced.

(Gov't mot. at 8 ¶¶ 26-27)[2]

---

[1] The original document states "January 2019" but, consistent with the context of this modification's genesis, we view this as a typographical error.

[2] While we see no direct support for this interaction in the Rule 4 file, appellant does not contest it in its opposition. For purposes of this motion only, we accept these statements as fact.

4. On January 8, 2020, the company supplying the temporary refrigeration units, Polar Leasing, invoiced the AF for rentals during the period of January 10 through February 9, 2020 (R4, tab 19).

5. In a request for a second modification, dated January 15, 2020, QTI wrote to the contracting officer (CO) stating they were "in a stop work mode" and discussing the issue with further performance as follows:

> Now that the real problem has been identified, we found out that in order to guarantee our work we must have all the outside mechanical system in good working condition . . . . For the units to work correctly, the outside unit must work interactively with the inside refrigerator and freezer unit . . . . [I]t has created a problem of which now we must perform outside of the scope of work.

(R4, tab 24 at 2-3) (Syntax in original)

6. The following day, the CO emailed QTI, asking "[i]f the contract remains as written, without modification, can you complete the contract?" In one of a series of responsive emails later that day, Mr. Ruiz replied "by all indications, the outside unit needs serious attention" and "[t]here can be no warranty whatsoever unless we at least repair the largest unit outside." Mr. Ruiz allowed that he could manage the changed work, but would require payment up front. (R4, tab 26 at 6-8)

7. On January 22, 2020, the CO wrote Mr. Ruiz, stating "[o]ur engineers have evaluated the outside units, and they agree the compressors, refrigerant lines, and refrigerant all need to be replaced. They also advised that only repairing/refurbishing at this point would be uneconomical. Thus, the government's need at the Aragon Dining Facility under this contract has changed significantly."[3] (R4, tab 26 at 4-5) Subsequent emails discussed a potential modification to "add the compressors to the current contract in order to fully replace the entire walk-in refrigeration system" and sought pricing from QTI to "replace all compressors" and potentially restructure the contract payments for QTI "to invoice as you complete work" (*id*. at 1-3). The CO went as far as drafting a new SOW for the replacement of the outside units, removing the interdiction against replacing the outside units still present in the contract, and requiring at least a one-year warranty for the new equipment (R4, tab 27 at 3). The parties never incorporated this SOW in a modification.

8. On February 11, 2020, the CO emailed Mr. Ruiz to say that he would not be issuing the SOW modification, though would be open to issuing a single modification

---

[3] The AF did not discuss the engineer's report in its motion.

extending the time to complete the contract. Mr. Ruiz replied the same day, now stating due to what it had discovered "after the New Years" that QTI "could not therefore make any guarantees, that the units would work correctly or at all, without the needed changes" and "[t]his project cannot be completed correctly without the proper change orders or modifications." (R4, tab 38 at 1-2)

9. Later the same day, the CO emailed QTI to state that it had not paid for the rental refrigerator costs in accordance with Mod. 00001, as the payment covering January 14 to February 14 remained outstanding (R4, tab 39 at 1). Appellant replied the following day, stating "we are not obliged to pay any longer the charges for rental refrigerators." Later that day, the CO wrote back that "you are certainly obligated by written agreement to pay the charges for the rental refrigerators. Not doing so is blatant nonperformance, which puts you at risk for termination for default." (R4, tab 40 at 1)

10. On February 19, 2020, the CO again asked QTI whether it was able to perform the contract as it was currently written (R4, tab 52 at 3). Appellant replied via an email accusing the government of bad faith, claiming the AF should pay the temporary refrigeration unit rental invoices, and requesting again the AF pay QTI in advance of its delivery of the refrigeration units (*id*. at 2-3). The CO responded with a cure notice, demanding payment of the temporary refrigeration unit invoices, and asking QTI for a revised delivery date to allow a final time modification (R4, tab 51). Appellant acknowledged the cure notice, but over the course of several emails, did not provide a substantial response. Instead of offering a way to cure the AF's identified deficiencies, QTI again requested an upfront payment and modification of the SOW. (*See* R4, tab 54 at 1, tab 55 at 1)

11. On February 25, 2020, the CO said he would grant appellant 14 additional days to complete the project in a new modification (R4, tab 60 at 4). Appellant, in its reply, outlined various concerns it also wanted addressed in the new modification, implying QTI needed a new SOW. The CO understood this response as an admission that "QTI cannot perform the contract how it's currently written." QTI replied the same day, stating in full: "[w]e can only finish the contract as per my above email and we are not to be charged for rental units either" (R4, tab 60 at 1-2).

12. Appellant and Polar Leasing signed a contract on February 27, 2020, for rental of two refrigeration units for two months from January 10, 2020 to March 9, 2020, delivered to Aragon Dining Facility (R4, tab 87 at 1). The same day, Polar Leasing sent an email to the CO, informing him that Mr. Ruiz "plans to pay for the extension [of the rental] but is awaiting payment from the Air Force" (R4, tab 61 at 1). Later that day Mr. Ruiz emailed the CO stating "[y]our should of by now received, information from Polar stating that Quality Trust will take responsibility accordingly. QTI will honor its agreement by way of our modification . . . ." (R4, tab 62 at 1)

4

(Syntax in original)  However, when the CO told QTI that Polar Leasing still had not been paid, QTI responded "when we start receiving funds from this contract based on SOW suggested we will pay them too" (R4, tab 65).

13. Appellant sent another response to the cure notice, dated February 22, 2020, which stated it could complete the contract "fourteen (14) weeks from the time the second modification is signed." QTI further indicated that the temporary refrigeration units were not yet on site, but could be picked up by March 3, 2020. (R4, tab 73)

14. On March 9, 2020, the AF terminated appellant for cause (R4, tab 76 at 1, tab 77 at 1). Appellant timely appealed the termination.

15. The government filed this motion for summary judgment on December 10, 2020. Appellant submitted multiple versions of its opposition and various exhibits across several emails, many of which were not sent to opposing counsel, in contravention of the Board's Orders and Rules. By Order dated March 26, 2021, the Board deemed the March 25, 2021, version of appellant's opposition to be the final version, and excluded the prior attachments after appellant refused to send them to opposing counsel.

<u>DECISION</u>

The government moves for summary judgment on three separate bases. First, that QTI failed to perform the contract by the completion date specified in Mod. 00001, March 9, 2020. Second, QTI failed to pay for the rental refrigeration units from January 10 through March 9, 2020, as required by Mod. 00001. Finally, the AF argues appellant failed to provide adequate assurances in response to the cure notice, justifying a termination. (Gov't mot. at 15-18)

*QTI's Opposition*

Appellant's response, to the extent that there is one, is provided in annotations to the government's motion. A note at the top of the document states annotations will be in red or blue text, though one annotation is in black, and another is in a comment bubble attached to the document. Most annotations are comments on facts or non-sequiturs rather than disputes of what the government states. One disagreement, in which QTI states only "this is a false statement," is immediately rebutted in the original motion by a quote from the record (app. opp'n at 10; *see also* gov't reply at 7 (discussing the rebuttal)). One of the few statements which bear on material facts is "QTI was awarded a contract that could not be completed the way that it was written up and guaranttee [*sic*] a good workmanlike quality product" (app. opp'n at 13).

5

Later, QTI states:

> By performing the contract the way it was written, would have QTI doing work illgally [*sic*] and land us in Jail. Another important bullet point is if QTI would have installed the units they would have failed. Based on what engineering problems were encountered. Also verified by Sgrt Lytie's egineers [*sic*] that made the report.

(*Id.* at 16) (Syntax in original) In rebuttal of the AF's argument that QTI failed to pay the temporary refrigeration unit invoices, appellant states, in whole "QTI has a contract in place with Polar rental and QTI is responsible ! Polar Leasing See Exhibit" (*id.* at 15) (syntax in original). The rest of appellant's argument points to a non-exhaustive list of what it characterizes as "material facts in dispute," none of which are relevant to the government's motion or explained in any detail (*see id.* at 18).

As evidenced by the arguments appellant advances in its opposition, it fails to understand what is and is not relevant to its appeal. None of the vague arguments cited above are relevant or material to the termination. However, since this is a motion for summary judgment, at this point all appellant must do is establish a single disputed material fact, which as we discuss below it has (barely) succeeded in doing. We hope by making this explicit, we can get this case back on track, which is in the interest of judicial economy.

*AF's Burden*

As the movant, the government must set forth sufficient material facts on all relevant issues raised by its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment will be granted if there are no genuine issues of material fact. *Id.*; FED. R. CIV. P. 56(a). A material fact is one which may make a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The government must establish a prima facie case, after which the burden of proof shifts to appellant. *Gerald R. Rouillard, III, d/b/a Int'l Gear Techs.*, ASBCA No. 58458, 14-1 BCA ¶ 35,765 at 174,991 (citing *Celotex*, 477 U.S. at 323). "This Board has always accorded *pro se* litigants leeway administratively, but the legal standards we apply must, of necessity, be the same for everyone." *Atl. Maint. Co.*, ASBCA No. 40454, 96-2 BCA ¶ 28,472 at 142,195. For the nonmovant, "[m]ere denials or conclusory statements are of course insufficient." *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed. Cir. 1986). "The nonmoving party is not required to present its entire case in response to a summary judgment motion to avoid defeat, but it must demonstrate that evidentiary conflicts exist on the record as to material facts at issue." *CLC Constr. Co.*, ASBCA No. 59110, 20-1 BCA ¶ 37,584 at 182,493.

*Impossibility*

In its opposition, appellant does echo assertions it made in the record without direct reference or citation, namely that performance of the contract as written was impossible (SOF ¶¶ 3, 5-6, 8, 10-11; app. opp'n at 16). The Federal Circuit has held that a party cannot be held to a contractual obligation which is impossible:

> [A] party has no duty to perform a contractual obligation if "performance is rendered impossible or impracticable, through no fault of the party, because of a fact, existing at the time the contract was made, of which the party neither knew nor had reason to know and the non-existence of which was a basic assumption of the party's agreement."

*Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed. Cir. 2001) (citing *Mass. Bay Transp. Auth. v. United States,* No. 283–89C, slip op. at 13-14 (Fed. Cl. May 14, 1999)).

While appellant claims it would have gone to jail if it had completed the work, it does not back this up by citing any criminal law such work would violate. Fortunately for appellant, the work merely needs to be impossible or impracticable to perform within the requirements of the contract and law, and not specifically the criminal code, to avail itself of this defense. Thus, if appellant is correct, its inability to perform the contract as written would be a defense to the AF's termination for cause.

*AF's Factual Omission*

The government refers in its motion to the CO having the base engineers inspect the outside units after Mr. Ruiz brought up the necessity of replacing the outside compressor units, but then drops this line of events after having brought it up (gov't mot. at 8 ¶ 27). A review of the record reveals that the result of the CO's inquiry is not at all beneficial to the AF's case. On January 22, 2020, the CO wrote Mr. Ruiz, stating "[o]ur engineers have evaluated the outside units, and they agree the compressors, refrigerant lines, and refrigerant all need to be replaced. They also advised that only repairing/refurbishing at this point would be uneconomical. Thus, the government's need at the Aragon Dining Facility under this contract has changed significantly." (SOF ¶ 7)

After this inspection by AF engineers, the CO discussed with appellant a contract modification that would have "add[ed] the compressors to the current contract in order to fully replace the entire walk-in refrigeration system" including the exterior equipment, and sought pricing from QTI to "replace all compressors." Further, it

would have removed the bold, explicit interdiction in the contract forbidding appellant from replacing that very equipment. (*Id.*)  For reasons the record does not make clear, the parties never executed this modification, and this restriction was still in place during the March 9, 2020 termination.  QTI, for its part, stated at the time that "there can be no warranty whatsoever unless we at least repair the largest unit outside" (SOF ¶ 6).  The contract required this warranty (SOF ¶ 1).  The government does not explain why it left this relevant information out of its motion.

Based on the parties' interactions subsequent to QTI raising the question of the suitability of the outside equipment on January 6, 2020, neither party appears to have been fully aware of the condition of the outside equipment at the initiation of the contract.  Nor did they appear aware of the ultimate effect that work would have on installing and warrantying the five walk-in units which were the original subject of the contract.  (*See* SOF ¶¶ 5-7)  However, we cannot know for certain.

If performance of the contract was impossible, this would provide QTI a valid defense against the government's termination for failure to perform, as that obligation would in fact never have arisen.  RESTATEMENT (SECOND) OF CONTRACTS § 266 (1981); *see also AIW – Alton, Inc.*, ASBCA No. 47917, 95-2 BCA ¶ 27,875 at 139,066.  The government's specifically not including the results of the base engineers' report in their motion does not help it hide or diminish this likelihood, but rather renders its factual and legal analyses incomplete.  The parties must provide further information before we know if appellant can fully avail itself of this defense.  There are material facts in dispute as to this issue that require further development.

The government's second theory and the remainder of its third theory imply that appellant's failure to pay the temporary refrigeration unit invoice is entirely independent of and severable from the obligation to install the walk-in refrigerator units.  To be sure, there are several instances of appellant stating it will not pay these costs (*see, e.g.*, SOF ¶ 9-10, 12), and appellant does not state that it has paid these costs.  Further, the language of Mod. 00001 states these costs were appellant's responsibility (SOF ¶ 2).  However, the issue of impossibility discussed above looms large.  The obligation to pay this invoice appears to be an outgrowth of the original refrigerator installation work.  The temporary storage units would not have been necessary without the obligation to replace the existing permanent units.  If this contract was impossible at award, we are reluctant to grant this motion upholding a termination based on repudiation or nonperformance of another related obligation that the AF added to an impossible contract.  This is so even if the second and third theories might succeed after more development of the record and legal analysis.  At the very least, the parties have not addressed in any detail in their filings whether this contract's central obligation was impossible to perform, and if it was, whether that affects termination based on QTI's repudiation or nonperformance of the secondary obligation as well.  Granting summary judgment is inappropriate at this time.

8

CONCLUSION

For the reasons discussed above, we deny the government's motion.

Dated:  June 2, 2021

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62576, Appeal of Quality Trust, Inc., rendered in conformance with the Board's Charter.

Dated: June 9, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals