# United States Court of Appeals for the Federal Circuit

---

**SUFI NETWORK SERVICES, INC.,**
*Plaintiff-Cross-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2013-5039, -5040

---

Appeals from the United States Court of Federal Claims in No. 11-CV-0804, Judge Thomas C. Wheeler.

---

Decided: May 29, 2014

---

FREDERICK W. CLAYBROOK, JR., Crowell & Moring LLP, of Washington, DC, argued for plaintiff-cross-appellant. With him on the brief was BRIAN T. MCLAUGHLIN.

KIRK T. MANHARDT, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and DOUGLAS T. HOFFMAN, Trial Attorney.

---

Before NEWMAN, LOURIE, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

The United States appeals from a decision of the United States Court of Federal Claims that awarded $118.76 million in damages, plus interest, to SUFI Network Services, Inc., for breach of contract. *SUFI Network Servs., Inc. v. United States*, 108 Fed. Cl. 287, 295 (2012). SUFI cross-appeals, seeking additional damages. We affirm in part, reverse in part, vacate in part, and remand.

## BACKGROUND

On April 26, 1996, the Air Force Non-Appropriated Funds Purchasing Office ("Air Force") entered into a contract with SUFI, under which SUFI would install and operate telephone systems in guest lodgings on certain Air Force bases in Europe. SUFI agreed to furnish and install the necessary equipment, including cables and switches, and to operate the systems once installed, at no cost to the government; in exchange, the Air Force agreed that "a SUFI telephone system (SUFI network) was to be the exclusive method available to a guest for placing telephone calls at the lodging." Br. for Appellant U.S. at 4. Exclusivity was central to the bargain because SUFI's sole compensation for its up-front investments and operational costs was a portion of the revenues generated by local and long-distance telephone charges paid by guests when making calls to off-base locations. The contract originally had a ten-year term but in March 2000 was extended to fifteen years.

Soon after SUFI began offering service in January 1997, disputes arose about the Air Force's role in not protecting SUFI, under the exclusivity guarantee, against the revenue-limiting diversion of calls from SUFI's systems. It is not disputed here that the contract permitted SUFI to block access to other carriers' networks (for

instance, by blocking access to calling cards) and required the Air Force to remove or disable any preexisting Defense Switched Network (DSN) telephone lines in the lodging hallways and lobbies.  Nevertheless, DSN phones remained in place after January 1997, and lodging guests began engaging in "toll skipping," often with the assistance of Air Force personnel: guests avoided SUFI's charges by using DSN phones or, when using in-room SUFI phones, by engaging a DSN operator (or other Air Force agent) to patch a call through to a long-distance destination or to the toll-free number of another long-distance carrier.  Moreover, although SUFI and the Air Force agreed to permit soldiers on temporary duty to be patched through to long-distance numbers for periodic "morale" calls of limited duration and frequency, call records showed that, with Air Force assistance, guests often exceeded the limits, placing multiple consecutive calls or lengthy individual calls.

After the Air Force declined to implement adequate controls to curb DSN and patched-call abuse, SUFI blocked guest-room access to the DSN operator numbers but permitted morale calls to be placed from designated lobby phones, the latter under Air Force monitoring through sign-in logs.  But Air Force personnel failed to require guests to sign the logs and, in addition, gave guests new access numbers to reach the DSN operator, thereby helping them to circumvent SUFI's charges.

Guest use of calling cards also presented problems under the contract.  On June 9, 1999, the parties agreed to modify the contract with respect to charges for toll-free calls.  Modification No. 5 states:

> TOLL FREE CALLS: $1.00 CONNECTION FEE. (SOME INTERNATIONAL "TOLL FREE" CALLS MAY BE SUBJECT TO BILLING, FOR EXAMPLE, INTERNATIONAL TOLL FREE CALLS TO OTHER COUNTRIES, WHERE A

HOST NATION PASSES ALONG A CHARGE, WILL BE SUBJECT TO CONTRACTOR'S STANDARD PER MINUTE CHARGE FOR THAT COUNTRY.)

*See SUFI Network Servs.*, ASBCA No. 54503, 04-1 BCA ¶ 32,606 at 161,365 (Apr. 22, 2004) (*SUFI I*) (quoting provision). On November 5, 2003, the Air Force cited Modification No. 5 as authority to "open toll free calls, to include calling cards at the $1.00 connection fee," and ordered SUFI to "remove all restrictions on toll free calling." *Id.* SUFI was forced to comply with the demand for about six months in 2004.

In response, SUFI challenged the Air Force's interpretation of Modification No. 5 and asked the contracting officer to decide "whether Modification 5 (or any other part of the Contract) requires SUFI to remove restrictions on toll-free calls accessing other long-distance carriers." *Id.* SUFI also asked the officer to decide whether the Air Force's directive that SUFI remove such restrictions would constitute a "material breach[] of contract that permit[s] SUFI to cancel the Contract and stop work." *Id.* The contracting officer issued a final decision denying SUFI's claims on January 15, 2004. On SUFI's appeal pursuant to the contract's "disputes" clause, however, the Armed Services Board of Contract Appeals (Board) concluded otherwise. The Board held that SUFI could not be required to remove restrictions on toll-free calls, that the government breached the contract in its order regarding toll-free calls, that the breach was material, and that SUFI could therefore stop performance of the contract. *SUFI Network Servs.*, ASBCA No. 54503, 04-2 BCA ¶ 32,714 at 161,868-69 (Aug. 17, 2004) (*SUFI II*); *SUFI Network Servs.*, ASBCA No. 54503, 04-2 BCA ¶ 32,788 at 162,193-95 (Nov. 1, 2004) (*SUFI III*).

On August 25, 2004, SUFI notified the contracting officer that it intended to stop work on the contract, but

would negotiate with the Air Force over transitional measures to minimize inconvenience to guests. Ultimately, SUFI, while maintaining its claims for breach of contract, sold the telephone system to the Air Force for $2.275 million. The Air Force took over operation of the telephone system on June 1, 2005.

One month later, SUFI submitted twenty-eight monetary claims, totaling $130.3 million, to the contracting officer. The officer denied all of the claims, except that he allowed SUFI $132,922 on its calling-card claim. SUFI appealed to the Board, which granted only partial relief to SUFI, on twenty-one of the claims, in a series of decisions between 2006 and 2010. The Board's final award was approximately $7.4 million in damages, plus interest.

SUFI challenged the Board's decisions in the Court of Federal Claims by filing a contract action under the Tucker Act, 28 U.S.C. § 1491. The parties do not dispute that the Tucker Act covers SUFI's claims. Nor do they dispute that judicial review of SUFI's claims under the Tucker Act is governed by the Wunderlich Act, 41 U.S.C. §§ 321-322 (2006) (now repealed). *See Vista Scientific Corp. v. United States*, 808 F.2d 50, 50 (Fed. Cir. 1986).

SUFI did not challenge the Board's ruling on some claims, which accounted for approximately $2.8 million in damages, plus interest. That amount became final. SUFI challenged the Board's ruling regarding a number of claims, moving for judgment on the administrative record: Count I (calling cards); Count III (hallway and lobby DSN phones); Count V (other operator numbers and patching); Count VI (early DSN abuse); Count VII (Delta Squadron); Count VIII (Prime Knight lodgings); Count IX (Kapaun line charge); Count XI (German troops housing); Count XV (general lack of cooperation); Count XVI (post-termination lost profits); Count XVIII (SIMS/LTS interfaces); and Count XXIII (change of Air Force switches).

On November 8, 2012, the Court of Federal Claims granted SUFI's motion. The court awarded SUFI damages of $118,764,081.34, plus interest, for the claims that were appealed—mostly representing lost profits both before termination of the contract and after termination. *SUFI Network Servs.*, 108 Fed. Cl. at 321-22. That award was more than $114 million greater than the Board award on the same claims. *Id.*

The United States appeals the increased award. It accepts that it is liable for breach of contract, appealing only with regard to the amount of damages. SUFI cross-appeals, seeking additional damages. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Board decision in this case under the Wunderlich Act, previously codified at 41 U.S.C. §§ 321-322. Although the Act has been repealed, the repeal does not affect this case—involving judicial review of an administrative decision in a government-contract case that the parties agree is within the Tucker Act and outside the Contract Disputes Act—because SUFI initiated these proceedings at the Board before the repeal. Pub. L. No. 111-350, 124 Stat. 3677, 3855, 3859 (Jan. 4, 2011).

Under the Wunderlich Act, the Board's "decision shall be final and conclusive unless the same is fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence," 41 U.S.C. § 321 (2006), and "[n]o Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board," *id.* § 322. Although cases subject to the Act involve contract disputes, the judicial proceeding is one of judicial review of agency action. As relevant here, in applying the express statutory standard, we, like the Court of Federal Claims, decide legal issues de novo, review the Board's factual findings

for lack of substantial evidence, and ensure that the Board's reasoning was not "capricious or arbitrary." *See Granite Const. Co. v. United States*, 962 F.2d 998, 1001 (Fed. Cir. 1992).

The corollaries for issues that involve factual findings and record evidence are familiar. In *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 716-17 (1963), the Supreme Court held that a court reviewing a Wunderlich Act case is limited to the administrative record and may not take new evidence. Shortly thereafter, the Court clarified that, "[w]hen the Board fails to reach and decide an issue because it disposes of the appeal on another ground," the reviewing court, if it later rejects the relied-on ground, should generally order a remand for the Board to address the issue it had not reached before judicial review. *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 428-430 (1966); *see Wilner v. United States*, 24 F.3d 1397, 1408 (Fed. Cir. 1994) (Bennett, J., dissenting) (stating that *Bianchi* "required the Court of Claims to remand cases back to the agency board whenever additional findings of fact became necessary"). On the other hand, a remand to the Board is sometimes unnecessary— not only where the dispute turns only on legal issues, but even where a factual dispute exists if no further record development is appropriate and the fact is one "as to which the evidence is undisputed" or "is of such a nature that as a matter of law the Board could have made only one finding of fact." *Maxwell Dynamometer Co. v. United States*, 386 F.2d 855, 870 (Ct. Cl. 1967) (no remand necessary); *see Collins Int'l Serv. Co. v. United States*, 744 F.2d 812, 816 (Fed. Cir. 1984) ("[T]he Claims Court may make findings of fact in this type of case [under the Wunderlich Act] where the evidence on the record is uncontroverted or undisputed.")

We conclude that several matters require additional factual findings. None of those matters fall within exceptions to the general rule of remand to the Board on factual

matters. Nor is this a case in which we conclude that "the Board will not promptly and fairly deal with the merits of the undecided issue." *Anthony Grace*, 384 U.S. at 430. Thus, any new factual findings that are required should be made by the Board.

## Burden of Proof

Before discussing the substance of particular damages issues, we address whether the Board properly allocated the burden of proof regarding certain issues that arose in assessing lost-profits damages. As the non-breaching party seeking damages for breach in the form of lost profits, SUFI must prove, by a preponderance of the evidence, that

> (1) the loss [it claims] was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); *see Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001). Where a defendant argues that, even had there been no breach, there would have been some impediment to the plaintiff's ability to make a profit, the defendant must point out the alleged impediment, but "[t]he burden of proof on the issue of causation in a lost-profits case [remains] on the plaintiff without regard to the nature of the impediment that the plaintiff would have had to overcome in the nonbreach world to make a profit." *Nycal Offshore Dev. Corp. v. United States*, 743 F.3d 837, 844 (Fed. Cir. 2014). That principle is not altered by the accommodation of reasonable imprecision in the plaintiff's quantification of damages that would compensate for proven loss, *see id.* at

845, or by rules about offsets of retained benefits in cases involving reliance-interest damages (unlike the lost-profits damages sought here), *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1370 (Fed. Cir. 2005); *Caroline Hunt Trust Estate v. United States*, 470 F.3d 1044, 1052 (Fed. Cir. 2006).

Here, SUFI claims as lost profits an amount that represented what it would have earned if (subject to certain qualifications) every long-distance call that was in fact placed on alternative networks (in the actual, breach world) had instead been placed on SUFI's network and gone on for just as long (in the hypothetical, nonbreach world). The government claims that, due to SUFI's high per-minute calling rates, guests would have placed fewer and shorter calls on SUFI's network had they been unable to use the alternative networks. The Court of Federal Claims mischaracterized this dispute as raising an issue on which the government bore the burden of proof. *SUFI Network Servs.*, 108 Fed. Cl. at 299. Once the government identified alleged impediments to the claimed amount of lost profits, SUFI had the burden to show by a preponderance of the evidence that its high rates would not have prevented it from earning the profits it claims—and to quantify the amount by a reasonably certain estimate.

Although the Board did not err in placing the burden on SUFI to prove its damages, in some instances, as we will discuss, the Board erred because it rejected SUFI's calculations in favor of ones that were not supported by substantial evidence. In other instances, SUFI has not demonstrated that the Board's decision lacked substantial evidentiary support.

### Count I (Calling Cards)

SUFI claimed close to $1 million in lost-profits damages from the government's breach in requiring SUFI to allow guests to use calling cards from February to August 2004—which, SUFI alleged, diminished the total number

of call minutes guests paid SUFI for. *SUFI Network Servs.*, ASBCA No. 55306, 09-1 BCA ¶ 34,018 at 168,275-76 (Nov. 21, 2008) (*SUFI VIII*). SUFI's methodology was to multiply the calling-card usage minutes by SUFI's weighted-average long-distance rate, and then to subtract costs it would have incurred had the calls been made on its network and revenues it actually received from the calling-card minutes. *Id.* The Board declined to adopt this methodology, which counted all calling-card minutes as minutes that would have been spent on SUFI's network without this breach. *Id.* at 168,276. Instead, the Board compared SUFI's monthly revenues before February 2004 (*i.e.*, before SUFI lost revenues due to the calling-card breach) with revenues during the February-August period of calling-card use and a post-August period of transition back to calling-card blocking. *Id.* The Board's method resulted in $188,637.80 in lost revenues, which it awarded as damages (along with a small additional amount that is not material here). *Id.*

Despite the large gap between SUFI's claimed losses and what the Board calculated, SUFI has failed to show that the Board's methodology was not supported by substantial evidence. SUFI scarcely discusses this matter in its brief, relying entirely on the criticism of the Board by the Court of Federal Claims, which reasoned that the records of calls placed via calling cards were the "best evidence" of SUFI's losses and that, because "SUFI was experiencing a multitude of other breaches simultaneously," it would be "impossible to isolate the calling card breach using the Board's methodology." *SUFI Network Servs.*, 108 Fed. Cl. at 310. But the Court of Federal Claims did not cite any evidence to indicate that the losses due to *other* breaches so changed during the comparison periods that it was unreasonable to use the comparison to estimate the losses attributable to calling-card usage alone. Under a substantial-evidence standard, SUFI has shown no reason that this kind of event study

was impermissible, especially when coupled with plausible questions, given the price differences, about whether the calls guests placed using calling cards are the best evidence of the revenues SUFI would have earned in the nonbreach world.

Because we cannot agree that the Board's methodology was unsupported by substantial evidence or was otherwise not in accordance with the law, its damages calculation with respect to lost revenues attributable to calling-card usage should stand. Accordingly, we reverse the Court of Federal Claims on this issue.

### Count III (Hallway and Lobby DSN Phones)

In calculating lost profits resulting from the Air Force's failure to remove hallway and lobby DSN phones, which siphoned calls from room phones on SUFI's network, SUFI relied on the use of "surrogate" phone records to estimate how many calls were placed on those improperly retained phones. Because of the government's loss of call records for most of the DSN phones in question, SUFI had records only of the dates particular hallway/lobby DSN phones were in service, not of the actual calls placed on most of the phones. *SUFI Network Servs.*, 108 Fed. Cl. at 305; *SUFI VIII* at 168,242. Given the limited data available, SUFI turned to certain phones for which complete call records were available—namely, certain lobby phones that it operated, which had worldwide direct-dial DSN access. *SUFI VIII* at 168,238. SUFI then chose the "surrogate" phone with the lowest monthly usage (in order to be conservative) and multiplied that monthly usage by the number of months each hallway/lobby DSN phone was in service (when it should not have been). *Id.* at 168,238-39. SUFI used that calculation to estimate the profits it would have earned had the calls placed from the hallway/lobby DSN phones instead been placed from SUFI's in-room phones (and lasted as long). SUFI excluded only an amount estimated to reflect local calls on

those DSN phones, for which SUFI would not have levied a charge even if placed from in-room phones (because SUFI provided local DSN access for free). *SUFI Network Servs.*, ASBCA No. 55306, 09-2 BCA ¶ 34,201 at 169,089 (July 15, 2009) (*SUFI IX*).

Although SUFI's methodology resulted in $53 million in alleged losses, the Board found only $1.16 million in losses. *Id.* The Board's approach seemingly rested on two premises. One was that SUFI's "surrogate" phones "were not hallway/lobby DSN phones and their call records were not probative of the claimed lost revenue from non-official calls on the hallway/lobby DSN phones." *Id.* The other—which is not entirely explicit or clear in its foundation—was that, under its contract, SUFI could not (and therefore would not) have charged for guests' in-room dialing of the Air Force operator to obtain DSN access to make any "official" call, even a long-distance (as opposed to local) call. *See id.* at 169,088-89. On that apparent premise, any "official"-call minutes spent on the (improper) hallway/lobby DSN phones did not count toward calculating profits SUFI would have earned in the absence of those phones, because SUFI could not have charged for those minutes if the caller had spent them in calls made from the in-room SUFI phones.

Instead of adopting SUFI's methodology, the Board reviewed 173,000 of the 4,274,690 minutes for the hallway/lobby DSN phones for which call records were available, and "determined that 13% of those minutes were during other than normal duty hours at the locations called, and therefore more likely than not to have been non-official calls." *Id.* at 169,089. Extrapolating from this percentage, the Board ultimately tallied about 1.7 million minutes as "a fair and reasonable approximation of [the number of minutes of] the non-official calls that in the absence of the hallway/lobby DSN phones would have been placed over the SUFI phones." *Id.* The Board multiplied that number of minutes by SUFI's weighted-

average per-minute profit of about $0.67, and made certain adjustments, to arrive at its $1.16 million damages award for Count III.

We agree with SUFI and the Court of Federal Claims that the Board erred in determining SUFI's lost profits for Count III. First, the Board failed to consider whether an adverse inference should be drawn against the government on the issue of the missing call records, as the Air Force failed to maintain the records even though it was on notice of this potential contract dispute. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. . . . [In a variety of cases], the wrongdoer may not object to the plaintiff's reasonable estimate . . . because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.").

Moreover, the Board did not cite to substantial evidence to justify its own methodology for Count III (unlike for Count I). Even without regard to questions about the premise that SUFI could not charge for any "official" in-room DSN call, whether local or (operator-assisted) long-distance, the Board did not set forth substantial evidence to support, or reasonably justify, the crucial premise for its discarding 87% of the calls on hallway/lobby DSN phones—namely, that all minutes of all calls made during normal business hours were "official" (and thus not ones SUFI would have been able to charge for in the absence of the hallway/lobby DSN phones). That idea is so far from self-evident that it cannot be adopted without substantial record support and reasoned consideration of the pertinent evidence. The Board opinions are inadequate on this crucial point in this large-dollar dispute. Among other things, the Board has not adequately addressed SUFI's submission that guests could obtain Air Force reimbursement for legitimate official long-distance calls made

from their rooms, which might suggest that resort to the hallway/lobby DSN phones was in large part for non-official calls.

The Board also provided inadequate support for its rejection of SUFI's core contention that a reasonable estimate of the number of additional minutes it would have had on its network, but for the Air Force's improper maintenance of the hallway/lobby DSN phones, was the number of non-local minutes those phones were used (reasonably estimated). The Board adverted in passing to, though did not rely on, the idea that "the personal cost to the caller of using the SUFI phones" would have led to fewer in-room minutes than hallway/lobby minutes, *SUFI IX* at 169,089. The proposition that purchases fall as prices rise certainly is true within a very wide range of circumstances. But the particular circumstances at issue can matter, and the Board here did not analyze the distinctive circumstances of the present case. It did not attempt to assess the magnitude of any purchase-limiting effect or, more basically, consider all relevant real-world record facts that might affect whether, in this context, it might even be the case that, on balance, fewer minutes were spent on hallway/lobby calls than would have been spent on calls made from guest rooms (in the absence of hallway/lobby phones), despite the higher cost of in-room calls. There is record evidence that, hallway/lobby DSN phones being few in number, long lines formed for use of some of those telephones, which might have created pressure for callers to cut calls short; moreover, the hallway/lobby telephones afforded little if any privacy. The Board did not examine this and possibly other evidence to set forth a sound basis for rejecting the number of minutes of calls placed on the "surrogate" DSN phones as a reasonable estimate of the measure of minutes lost to SUFI.

The Board's rationale is deficient for the foregoing reasons, even without regard to the soundness of the

Board's apparent premise that SUFI could not charge for in-room access to the DSN for "official" long-distance calls. For these reasons, we agree with the Court of Federal Claims that the Board erred in determining the damages for Count III. Under the Wunderlich Act, this count should be remanded to the Board for reconsideration, not independently adjudicated in the courts. And in that reconsideration, the Board should more squarely review the legal and evidentiary basis of its apparent premise about "official" long-distance DSN calls than it has yet done. The Board's opinions addressing that issue, and the parties' briefs on it, leave the matter unclear. Whether or not we could decide this in the first instance, we think it advisable for the Board, and the parties, to address it more fully and clearly first, given that we order a remand on Count III in any event. We vacate the Court of Federal Claims' ruling on this issue and order it remanded to the Board for those purposes.

The remand relating to this count should also encompass several issues SUFI has raised in its cross-appeal. Principally, SUFI contends that the Board erred in setting the date from which interest should run on its damages for Count III. It is undisputed that under a partial settlement agreement, SUFI is entitled to interest from the date it actually incurred its damages. *SUFI Network Servs.*, ASBCA No. 55306, 10-1 BCA ¶ 34,327 at 169,534 (Dec. 14, 2009) (*SUFI X*). To simplify the required computation for Count III, SUFI asked the Board to use the "weighted" midpoint of the dates it incurred its damages, accounting for the fact that damages on Count III were "front-loaded"—*i.e.*, more damages were incurred earlier than later, because at some point during the damages period, the Air Force removed some of the breaching phones. *SUFI Network Servs.*, ASBCA No. 55306, 10-1 BCA ¶ 34,415 at 169,887 (Apr. 5, 2010) (*SUFI XI*).

The Board initially selected June 15, 2001, as the starting date for interest on damages—a date the Board

identified as "the approximate mid-point of the DSN call data from September 1997 through May 2005, the period for which SUFI claimed damages," *SUFI X* at 169,534. SUFI then asked the Board to reconsider its decision, urging that "a weighted midpoint of March 1, *2000*, be set or, at a minimum, the unweighted midpoint of March 1, *2001*." *SUFI XI* at 169,887. In response, the Board stated that it was "not persuaded to calculate a 'weighted midpoint,' inconsistent with the unweighted midpoints we used in our prior decisions," but would correct the unweighted midpoint from June 15, 2001, to March 1, 2001, as SUFI alternatively requested. *Id.*

When SUFI challenged the rejection of the March 2000 date in the Court of Federal Claims, that court rejected the challenge because SUFI actually proposed March 1, 2001, to the Board as an alternative. *SUFI Network Servs.*, 108 Fed. Cl. at 306. We see no sound basis for that ruling, because SUFI preserved its argument for the weighted midpoint by making that argument to the Board. On the merits, moreover, the Board gave little explanation for rejecting the weighted midpoint, citing only its desire for consistency with prior decisions. We conclude, therefore, that when the Board reconsiders Count III, as we require, it should also reconsider its rejection of the weighted-midpoint starting date for interest on damages. And at the same time, the Board should address SUFI's "evidence to correct the Ramstein Building No. 303 DSN phone start date from October 2000 to October 1999" and evidence to "correct[] the 10,135 average monthly rate to 10,609" minutes per month. *SUFI VIII* at 168,239.

Count V (Other Operator Numbers and Patching)

Before October 1998, SUFI agreed to carry "morale" calls free of charge. *SUFI VIII* at 168,250. In October 1998, SUFI added to its switches two DSN access numbers for soldiers to use for these calls, which were sup-

posed to be limited to 15 minutes per soldier every two weeks. *Id.* SUFI's monitoring revealed calls up to three hours long and multiple consecutive calls from the same guest room; SUFI's records showed that guests exceeded morale-call limits by 3,046.5 minutes (50 hours and 46 minutes) in the first three months of 1999 alone. *Id.* SUFI responded by blocking the specially established telephone numbers, but Air Force personnel made other local DSN numbers available to circumvent the block— another breach of contract. *Id.* at 168,250-54. SUFI identified 5 direct and 34 indirect DSN access numbers to which 70 or more calls of at least 10 minutes were placed, while the record showed that the average length of a DSN call from a non-lodging location (thus, more likely to be official in nature) was just under 2 minutes. *Id.* at 168,251, 168,254. In seeking damages for this breach by the government, SUFI asked for compensation for each minute of all calls that lasted at least 10 minutes on the identified lines. *Id.* at 168,253.

The Board rejected SUFI's methodology because SUFI failed to show that the calls in question were not patched through to local numbers, rather than to long-distance numbers. *Id.* at 168,254 ("To the extent any such calls, even if non-official, were to local phone numbers, they did not circumvent SUFI's commercial long distance phone network or result in any lost revenues thereby. Except for morale calls, this evidentiary lacuna is fatal to SUFI's proof of liability for lost revenues."). For that reason the Board awarded damages only for the 3,046.5 of excess morale-call minutes for which SUFI produced records. *Id.*

We agree with SUFI that the Board's determination on Count V is not supported by substantial evidence. Even if SUFI did not carry its burden to prove that *all* of the calls in question were long-distance calls, there was no basis for the Board's conclusion that *none* of the calls could be counted towards SUFI's recovery. But the Court of Federal Claims erred in making its own factual finding

on this issue. *SUFI Network Servs.*, 108 Fed. Cl. at 308. We vacate that ruling and order a remand to the Board for reconsideration of whether SUFI's evidence provided a reasonably certain estimate—a fair and reasonable approximation—of damages from this breach. *See National Australia Bk. v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006); *Bluebonnet Sav. Bk. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).

### Count VI (Early DSN Abuse)

In mid-1997, pursuant to its contract, SUFI provided guests at the Ramstein military base with the ability to use the telephone to obtain access to the DSN, including the ability to make local calls directly over that network. *SUFI VIII* at 168,233. But according to its later evidence, SUFI soon concluded that the DSN access was being used for long-distance calls, made through DSN (Air Force) operators. *Id.* SUFI's representative testified that he observed a 50% reduction in long-distance calls over the SUFI network after the Ramstein introduction of DSN access, with a pattern of long calls (lasting up to four hours) to the DSN information operator. *Id.* When it then blocked access to the DSN operator numbers, SUFI submitted, its call revenues returned to normal. *Id.*

The Board analyzed SUFI's long-distance revenues for the period in question, but did not find the recollection of SUFI's representative to be substantiated. *Id.* at 168,235. On the contrary, the Board found that SUFI's average monthly revenues increased, rather than decreased, after SUFI began providing DSN service. *Id.* Accordingly, it held that SUFI had "not established that alleged 1997 DSN abuse caused a reduction in its long distance call revenues" and denied any relief on Count VI. *Id.*

The Court of Federal Claims reversed the Board on the ground that "[t]here were multiple other breach factors affecting SUFI's monthly revenues, and it is incorrect to rely upon the monthly averages as if this

breach were the only one in play." *SUFI Network Servs.*, 108 Fed. Cl. at 316. For the same reasons we have given in discussing Count I, we do not agree that the Board's methodology comparing pre- and post-breach revenues lacks substantial evidence. Accordingly, we reverse the Court of Federal Claims on Count VI with respect to lost profits.

SUFI also sought damages, under Count VI, to compensate it for "extra work" it had to perform, and out-of-pocket costs it incurred, in addressing the DSN abuse involving Air Force operators. The Board did not address these claims. *SUFI VIII* at 168,235. On appeal, the government evidently concedes liability for extra work and costs—under at least the FAR § 52.243-1 "Changes–Fixed–Price (AUG 1987)" clause, incorporated into the contract, *see* J.A. 944B; *SUFI I* at 161,364. But it contends that the Board should be the one to calculate the amounts due in the first instance. We agree. Although we do not disturb the Board's findings with respect to lost profits, we vacate the Court of Federal Claims' ruling on Count VI in this respect and order a remand for the Board to determine SUFI's extra-work and out-of-pocket damages for Count VI.

### Count VII (Delta Squadron)

One of the buildings covered by SUFI's contract (a lodging facility at Sembach Air Force Base) housed the administrative, maintenance, and transportation personnel for the Delta Squadron; before SUFI began service, five or six government-installed DSN telephones were available in the building for all Delta Squadron personnel to use. *SUFI VIII* at 168,260. SUFI requested the removal of those phones, as they were inside a lodging facility, contrary to the contract, and the phones were eventually removed. *Id.* As to the last two such phones, the Board's findings (and the record presented to us) are unclear, but it appears that the Air Force agreed to the

removal only if SUFI replaced those phones with its own. In April 2000, SUFI installed two of its own phones in the Delta Squadron lounge, to be used (subject to monitoring) only for expedited access to the guest rooms of Delta Squadron personnel and for morale calls to outside numbers. *Id.* Call records revealed, however, that much of the use fell outside those limits. *Id.* When SUFI complained to Air Force personnel regarding the abuse and threatened to remove the phones, SUFI was told that, if it did so, the Delta Squadron commander would order his troops not to use SUFI's room phones. *Id.*

The Board awarded SUFI lost profits for the government-installed phones, but awarded no damages for abuse of the SUFI-installed phones, because it found that "SUFI waited from 13 April 2000 until 12 June 2003 to threaten to remove those phones" and found no government breach regarding the SUFI-installed phones. *Id.* at 168,262. The Board later corrected its findings to reflect that SUFI first threatened to remove the phones on or about August 11, 2001, but did not otherwise alter its holding. *SUFI IX* at 169,090.

The circumstances under which SUFI replaced the last two government DSN phones with its own phones are material to whether the Board's determination was supported by substantial evidence, but the record is incomplete on this issue. The Board did not discuss the evidence regarding the government's alleged initial refusal to remove the phones or eventual agreement to removal only if SUFI replaced them with its own phones. Although the Court of Federal Claims seems to have concluded that the government conceded SUFI's crucial factual allegations, *SUFI Network Servs.*, 108 Fed. Cl. at 309 n.13, it is not clear to us from the record that there are government concessions sufficient to make further factual findings unnecessary.

We therefore vacate the Court of Federal Claims' ruling on this issue and order the issue remanded to the Board for further findings. The Board should consider what the government has conceded and make factual findings regarding the circumstances surrounding SUFI's installation and maintenance of the two Delta Squadron phones. If SUFI installed and maintained those phones only under threats that breached the contract, the Board's rationale for denying recovery for losses caused by the presence of the SUFI-installed phones cannot stand. In singling out that scenario for comment, we do not constrain the otherwise-required inquiry on remand.

### Count VIII (Prime Knight Lodgings)

Unlike the other lodgings SUFI served, the Prime Knight lodging facilities at Ramstein had DSN phones in the guest rooms, with worldwide service, before SUFI's contract with the Air Force. *SUFI VIII* at 168,242-43. Although the contract provided that these phones were to be replaced with SUFI phones once SUFI began service, the Air Force refused to remove the phones until shortly after September 1998, twenty months after SUFI began service at Ramstein. *Id.* at 168,243-44. There is no dispute on appeal that the Air Force breached the contract by refusing to remove the phones. *SUFI Network Servs.*, 108 Fed. Cl. at 316.

SUFI estimated that it lost about $18,000 per month in revenues because of the government's breach, then multiplied that figure by the duration of the breach to arrive at a total of $188,260.20 in claimed damages. *SUFI VIII* at 168,243. The $18,000/month figure apparently reflected a comparison of the monthly revenues from the Prime Knight lodgings with the monthly revenues from other lodgings (on the same base) that did not have worldwide DSN access in the guest rooms, but the Board found that the averages were "misleading because they did not consider the number of rooms in each of the build-

ings." *Id.* The Board adopted an alternative methodology that compared the per-room revenues of the Prime Knight lodgings to the per-room revenues of other lodgings in the relevant time period, and found a difference of $690.58 per room. *Id.* at 168,245. The Board multiplied this per-room difference by the number of Prime Knight rooms (176) to arrive at a total-revenue difference of $121,542.08. *Id.*

Because the Board's damages determination for Count VIII was reasonable and supported by substantial evidence, the Court of Federal Claims erred in displacing it with its own damages calculation. *SUFI Network Servs.*, 108 Fed. Cl. at 317. The only explanation the Court of Federal Claims gave for rejecting the Board's calculation was that the "revenues received per room from other Ramstein lodging facilities were themselves re-pressed" as a result of other breaches, such as those involving "hallway and lobby DSN telephones." *Id.* But the Court of Federal Claims identified no reason to think that the Prime Knight and other Ramstein lodgings were affected differently by the other breaches—more precisely, no basis for concluding that the Board had to find such a difference. Indeed, building diagrams indicate that the Prime Knight lodgings, like others, made DSN phones available to guests other than in their rooms. J.A. 1562. Without a difference regarding other factors, the comparison of buildings the Board used to estimate the effect of the present breach is reasonable. Accordingly, we reverse the Court of Federal Claims on Count VIII.

## Count XI (German Troops Housing)

During the pre-contract bidding process, the Air Force made statements to SUFI about who would be staying at the lodgings SUFI would serve under the contract: "transient" guests "in transition between Europe and the USA," who would "use the long distance service to re-establish themselves in the USA or call relatives in the

USA." *SUFI VIII* at 168,269. The Air Force further stated that "Americans are frequent callers and use the long distance service." *Id.* Starting in March 2003, however, and without advance notice to SUFI, the Air Force housed non-transient German troops in some of the lodgings, an arrangement that lasted two years—until May 2005. *Id.* At the request of their commander, the Air Force decided generally not to give German troops personal identification numbers that would enable them to use SUFI's phones, although certain soldiers individually requested and received such numbers. *Id.* From March 2003 to May 2005, SUFI's revenues in the relevant lodgings declined to about 36% of the pre-March 2003 levels. *Id.*

The Board found that the Air Force's conduct regarding the German troops constituted a change in the terms of the contract that caused SUFI to have to undertake extra work and that reduced its revenues, justifying an equitable adjustment for SUFI's extra work. *Id.* at 168,270. The Board did not address SUFI's claim that the Air Force's actions breached implied duties of good faith and cooperation and violated the express terms of the contract; nor did the Board explain why it was not awarding damages for SUFI's lost profits on the phones in rooms occupied by the German troops. *Id.* In these circumstances, we cannot uphold the Board's decision under the Wunderlich Act standard of review. But the Court of Federal Claims erred in itself determining the proper damages for Count XI. We vacate the Court of Federal Claims' ruling on Count XI and order that count remanded to the Board for further consideration.

### Count XVI (Post-Termination Lost Profits)

Count XVI concerns SUFI's loss of profits for the years in which it would have enjoyed the fruits of the contract had there been no government breach, which led to the justified contract termination by SUFI. The parties

disagree about the interpretation of two contract provisions relevant to calculating SUFI's post-termination lost profits—concerning the term of the contract and whether SUFI would have served new lodging facilities as they were added to bases covered by the contract. Matters of contract interpretation are issues of law that we review de novo. *Massachusetts Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed. Cir. 2001).

*Contract Term.* Three provisions bear on determining the contract term for purposes of SUFI's post-termination lost profits. As modified, section F.4 provides: "The term of this contract will be for 180 months (15 years)." J.A. 965. As modified, sections H.27 and H.29 provide:

27. OPTION TO BUY EQUIPMENT

Upon completion of *the performance period of each site (15 years)*, and prior to removal of any contractor owned equipment, the Government shall have the option to buy existing equipment at fair market value, which shall be negotiated between the contracting officer and the contractor for each site.

. . . .

29. PERFORMANCE PERIOD

The performance period for each site will commence upon actual completion of installation, inspection and acceptance by the ordering NAFI [Non-Appropriated Fund Instrumentality] for the system ordered *for that particular site* and shall not exceed a period of 15 years from that date.

J.A. 966 (emphases added). Relying on section F.4, the Board interpreted the contract to provide for an across-the-board fifteen-year term from the date the contract was awarded, and thus set April 25, 2011, as the end date for contract performance for all sites. *SUFI IX* at

169,092. The Board considered its reading to be consistent with section H.29, which states only that the performance period for each site "shall not exceed a period of 15 years," not that the performance period for each site would last fifteen years. *Id.*

The Court of Federal Claims rejected the Board's interpretation, instead reading the contract to provide for a separate fifteen-year term for each site, running from the date of completion of installation, inspection, and acceptance by the ordering NAFI, as specified in section H.29. *SUFI Network Servs.*, 108 Fed. Cl. at 318. The court reasoned that the Board's interpretation would "render sections H.27 and H.29 meaningless and superfluous," because "there would be no reason to have other provisions addressing a performance period *for each site*." *Id.* We conclude that, although the Board's reading may not render sections H.27 and H.29 "meaningless and superfluous" (H.27 adds an option to buy equipment and H.29 specifies when SUFI must begin performing its duties under the contract), the Court of Federal Claims' interpretation is the more reasonable reading of the relevant contract provisions.

First, the Board's interpretation is in substantial tension with section H.27, whose language—"the performance period of each site (15 years)"—strongly indicates that the performance period for each site shall *last* 15 years, rather than merely that it shall not exceed 15 years. Second, given that the contract anticipates the addition of new sites years into the contract, with SUFI bearing substantial up-front installation costs for each site, it makes sense for the contract to be providing a site-specific performance period to permit recoupment of such investments. As the Court of Federal Claims reasoned, contracting for a separate term for each site "reflects the sound business principle that SUFI could not earn any revenue on its investment at a base until the telephone system was up and running." *SUFI Network Servs.*, 108

Fed. Cl. at 319. In the absence of a persuasive contrary showing, the fairer reading of the contract language, considering the economic logic of the bargain, is that the contract provided a performance period for each site.

Accordingly, we affirm the Court of Federal Claims' conclusion that SUFI's post-termination lost profits should be calculated for a term of fifteen years from the date of completion and acceptance of the telephone system at each site. The Board must recalculate damages under Count XVI on this basis.

*Serving New Facilities.* As part of its claim for profits it would have earned had the contract continued past its 2005 termination, SUFI contended that it would have served two lodging facilities the Air Force added to SUFI-served bases after that termination. Its sole argument, at this stage, is that it would have served those facilities because it had a contractual right to do so. We agree with the Court of Federal Claims that SUFI had no such contractual entitlement. *SUFI*, 108 Fed. Cl. at 319-20; *see also SUFI II* at 161,868-69; *SUFI III* at 162,194-95.

SUFI points to no contract provision that actually gives it that right. There also is no language making this contract a "requirements" contract, under which SUFI was entitled to meet all of some defined set of the Air Force's needs. Moreover, the contract provision that the parties identify as most relevant, section 3.11, points strongly against SUFI's argument: addressing "Expanded Service," it provides that SUFI is obligated to provide "expanded services . . . as requested by the government," and it includes "new buildings" within that provision. *See SUFI Network Servs.*, 108 Fed. Cl. at 319 (quoting provision). Far from entitling SUFI to provide certain service, including at new buildings, it merely obliges SUFI to do so, when "requested by the government."

SUFI has presented no evidence sufficient to create the asserted contractual entitlement, which is more

contrary to than supported by the contract language. It identifies no clear, pertinent pre-contract representations about new buildings. And we cannot conclude that the economic logic of the overall contractual bargain necessarily implies such an entitlement as to new buildings. SUFI simply has not shown that its interest in earning back its investments in particular buildings so clearly required that SUFI have the option to serve new buildings on the same base (if any were built) that an implied contractual provision of such an option must be inferred. Finally, the asserted contractual entitlement is not implied by the fact that, for many years, the Air Force exercised its discretion to request SUFI to provide certain "expanded service." Accordingly, we see no error in denying recovery for the two facilities built at SUFI-served bases after the contract termination.

### Counts XVIII and XXII (Interfaces and Switches)

Counts XVIII (SIMS/LTS Interfaces) and XXII (Change of Air Force Switches) relate to SUFI's claims for extra work and out-of-pocket expenses arising out of problems in making its communications systems function well when, as required, they connected with certain of the Air Force's systems. The Court of Federal Claims reversed the Board's finding of no liability, then calculated damages for these counts on its own. *SUFI Network Servs.*, 108 Fed. Cl. at 311-12, 314-15. On appeal, the government challenges only the Court of Federal Claims' decision to calculate SUFI's damages directly, rather than remand to the Board. We agree. We vacate the Court of Federal Claims' ruling in this respect and order remand for the Board to determine damages for Counts XVIII and XXII, consistent with the Court of Federal Claims' liability determinations.

### Amounts of Certain Compensable Expenses

There is no dispute here that SUFI is entitled to payment for certain expenses it incurred in performing the

contract or in responding to the breach, but the calculation of the payments due is in dispute. In order to calculate the payments due for certain identified, compensable work by SUFI, the Board determined the hourly rates of SUFI's employees who performed the work (dividing their annual salary by 2080, *i.e.*, 52 x 40, hours) and awarded SUFI hourly compensation at such rates, without adding amounts for SUFI's overhead or profits. On reconsideration, which the government did not oppose on this issue, the Board found that SUFI was entitled to both overhead and profits for the work that was compensable as an equitable adjustment under the contract's FAR § 52.243–1 provision, 48 C.F.R. § 52.243–1, but only overhead (not profits) for work that was compensable as damages for breach. *SUFI IX* at 169,094. The Board found overhead not proven, however, and so awarded nothing for overhead, and it made no change to its previous award of 10% profit on some of the contract-change work. *Id.*; *SUFI VIII* at 168,232-33, 168,274-75. The Court of Federal Claims, on review, held that SUFI was entitled to overhead and profits regardless of whether it incurred the expenses at issue because of a contract change or a breach, and awarded SUFI a 25% supplement to the labor-rate amount to cover both overhead and profits. *SUFI Network Servs.*, 108 Fed. Cl. at 300-01.

The Court of Federal Claims did not identify, and we do not see, any error in the Board's first step—determining base hourly labor rates. Nor do we see error in the Board's finding that SUFI's claim for overhead failed "for lack of proof," because "[t]he record does not show which costs SUFI classified as 'overhead' and whether SUFI added overhead costs to overhead expense items, to G&A [General and Administrative] costs or to the compensation of any employee or consultant." *SUFI IX* at 169,094. Although the government did not oppose the addition of overhead expenses, the Board found inadequate evidence in the record to quantify those expenses,

and we see no reason to disturb the Board's finding. To the extent the Court of Federal Claims concluded otherwise, we reverse that ruling.

As to profits, there is now no dispute that—as the Court of Federal Claims held, reversing the Board—SUFI is entitled to profits for the work and out-of-pocket expenses at issue, whether they resulted from a contract change or a breach. A dispute remains, however, about the amount to be awarded for such profits. In this respect, we see no error in the Board's selection of a 10% profit rate. Although section 3.11.1 of the contract specifies that, for additional work not specified in the contract, SUFI shall respond to the government's request and provide a "cost proposal of no more than 25% over cost," J.A. 938, neither that provision nor anything else in the contract says that SUFI shall be entitled to a 25% profit. The Board, in selecting a 10% profit rate, cited earlier Board decisions setting profit rates between 9% and 10%. *SUFI IX* at 169,095. Other than to complain that the Board's rate did not include overhead, SUFI does not identify error in the Board's selection of its profit rate. Accordingly, we vacate the ruling of the Court of Federal Claims and order a remand for the Board to include profits for all work and out-of-pocket expenses, whether incurred as a result of a contract change or breach.

## Kapaun Line Fee

Vogelweh Air Base and Kapaun Air Station, located at essentially the same place, were added to the contract by Delivery Order No. 4. SUFI's May 31, 1996 offer to the Air Force for Delivery Order No. 4 included the three Kapaun dormitories for the Non-Commissioned Officer Academy. According to SUFI, however, before it began the installations for Delivery Order No. 4, it received word from Donald Hall, the community lodging officer at Kapaun, that the Academy was closing and SUFI should delete the Kapaun buildings from the order. Although no

modification was issued removing the Kapaun buildings from the contract, SUFI performed the installation for Vogelweh, but did not wire Kapaun. Later, after completing its installation work at the location, the Air Force requested that SUFI serve Kapaun, but SUFI protested, in part because the need to redeploy its installation crew would increase its costs. SUFI negotiated with Contracting Officer Technical Representative Sellers and other Air Force personnel to install the Kapaun system in exchange for a $1 per-day, per-room line fee. Although SUFI did not receive a contract modification signed by the contracting officer that incorporated the new line fee, it proceeded with the installation, relying on promises by Representative Sellers and other Air Force personnel that the line fee would be approved. After the installation was complete, the Air Force refused to pay the line fee.

Although SUFI acknowledges that the contract does not provide for a line fee at Kapuan, SUFI contends that the Air Force is estopped from denying it payment in the amount of the line fee because Air Force personnel misled it into completing the installation by promising the requested line fee. To succeed in its claim, SUFI must show

> (1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

*Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992). It also must show that the government engaged in "affirmative misconduct," *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000), and that the Air Force personnel in question were acting within the scope of their authority, *see New Am. Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1081 (Fed.

Cir. 1989). The Board rejected SUFI's claim, *SUFI VIII* at 168,259; *SUFI IX* at 169,091-92, and the Court of Federal Claims affirmed, *SUFI Network Servs.*, 108 Fed. Cl. at 314 (Fed. Cl. 2012).

We affirm on this issue, because SUFI has not proved the third required element, *i.e.*, material prejudice due to its reliance. SUFI stakes its entire case on the conduct and presumptive authority of the Air Force representatives who communicated with it regarding the line fee. But SUFI has simply not established that Mr. Hall, the lodging officer who SUFI says originally told it not to wire Kapaun, and on whose statements SUFI evidently relied in not wiring Kapaun concurrently with Vogelweh, had any authority to modify the contract to remove Kapaun, or that he or any other Air Force representative engaged in any misconduct in permitting SUFI to wire Vogelweh without concurrently wiring Kapaun. And SUFI has made no claim that it suffered prejudice from the denial of the line fee even if it was independently obligated by contract to wire Kapaun.

Because SUFI decided to complete the Vogelweh installation without concurrently wiring Kapaun, despite the fact that there was no modification to the contract releasing it from its obligation to serve Kapaun, the fact that SUFI subsequently wired Kapaun only in reliance on the Air Force's false promises of a line fee is of no consequence. SUFI may have reasonably inferred from the Air Force's later conduct that the Air Force would not assert its rights to have SUFI wire Kapaun under the original (unmodified) Delivery Order, but it has not shown any prejudice from the government's delayed assertion of that right. On the contrary, Mr. Hall's statements about deleting Kapaun from the delivery order do not create an estoppel or a modification, and with no modification of the contract, SUFI was obliged to wire Kapaun. It was SUFI's own choice not to do so when it wired Vogelweh, a choice not connected to the Air Force's later alleged mis-

conduct. Costs it incurred in returning to the site to wire Kapaun are its own responsibility. Accordingly, we affirm the Court of Federal Claims on this issue.

CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, vacate in part, and remand to the Court of Federal Claims, with instructions to remand to the Board for further factual findings consistent with this opinion.

No costs.

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**